# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| ALEXANDRA LOPEZ, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| HYUNDAI MOTOR AMERICA, INC, HYUNDAI MOTOR CO., and HYUNDAI MOTOR MANUFACTURING ALABAMA LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

JURISDICTION AND VENUE ............................................................................... 3

THE PARTIES........................................................................................................ 8

I.     FACTUAL ALLEGATIONS ......................................................................... 14

   A.   System Operation and the Defect ................................................................ 14

II.    HYUNDAI'S KNOWLEDGE OF THE DEFECT AND ASSOCIATED SAFETY RISK
       22

   A.   Pre-Release Testing ..................................................................................... 23

   B.   NHTSA Complaints..................................................................................... 27

   C.   Warranty Data ............................................................................................. 32

   D.   Hyundai's Manufacturer Communications Related to the Defect.................... 33

III.   HYUNDAI CONTINUOUSLY TOUTED CLASS VEHICLES AS SAFE AND

DEPENDABLE, CONCEALING THE DEFECT ..................................................... 35

IV.    APPLICABLE WARRANTIES ................................................................... 37

V.     FRAUDULENT OMISSION/CONCEALMENT ALLEGATIONS ............... 39

VI.    TOLLING OF THE STATUTE OF LIMITATIONS..................................... 43

   A.   Continuing Act Tolling................................................................................ 43

   B.   Fraudulent Concealment Tolling ................................................................. 44

   C.   Discovery Rule Tolling................................................................................ 45

CLASS ACTION ALLEGATIONS ....................................................................... 46

CLAIMS FOR RELIEF ........................................................................................ 51

REQUEST FOR RELIEF ...................................................................................... 65

JURY TRIAL DEMANDED................................................................................. 66

i

Plaintiff Alexandra Lopez ("Plaintiff"), individually and on behalf of the other members of the below-defined nationwide and statewide classes, which she respectively seeks to represent ("Classes"), hereby alleges against Defendants Hyundai Motor America, Inc. ("HMA"), Hyundai Motor Company ("HMC"), and Hyundai Motor Manufacturing Alabama, LLC ("HMMA") (collectively "Defendants" or "Hyundai") upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## INTRODUCTION

1.    For decades, Hyundai has branded itself as a manufacturer of reliable cars. As a result, consumers reasonably expect, based on Hyundai's long-term advertising and branding, that Hyundai vehicles will operate without major mechanical failure during their expected useful lives.

2.    Hyundai manufactures and sells certain motor vehicles equipped with normally aspirated Theta III 2.5-liter GDI + MPI DOHC 16-valve Inline 4-cylinder engines, which utilize eight fuel injectors, two for each cylinder (the "Engine").

3.    This Engine, manufactured at Hyundai's manufacturing facility in Alabama, is part of the Smartstream engine family.[1]

---

[1]   https://www.hmmausa.com/our-company/about-hmma/ (last visited August 7, 2025).

1

4.    The Engines are equipped with a Dual-Port Fuel Injection ("DPFI") system utilizing both Multi-Point Fuel Injection ("MPI") and Gasoline Direct Injection ("GDI").

5.    Hyundai's Engine suffers design and/or manufacturing defects that cause aggressive fouling or degradation of GDI fuel injectors under normal and expected operating conditions (the "Defect").

6.    Hyundai knew about the Defect before the Class Vehicles were sold but did not disclose the Defect to Plaintiff or Class Members at the time of sale and subsequently failed to redesign and replace the defective components.

7.    The Defect impacts owners or lessees of model year 2022 to 2023 Hyundai Tucson and Santa Cruz, model year 2021 to 2023 Santa Fe, and model year 2020 to 2023 Hyundai Sonata vehicles equipped with the Smartstream Theta III 2.5L MPI + GDI Engine (the "Class Vehicles").[2]

8.    Had Plaintiff and the other Class Members known about the Defect, they would not have purchased or leased the Class Vehicles or would have paid substantially less for them.

9.    The Defect has diminished the value of the Class Vehicles.

---

[2] Plaintiff reserves the right to modify or amend the definition of the Class Vehicles.

10.    On behalf of herself and the proposed Classes defined below, Plaintiff asserts claims against Hyundai for breach of express and implied warranties, violation of Georgia's Consumer Protection Act, common law fraud, and violation of the Magnuson-Moss Warranty Act. Plaintiff seeks damages and equitable relief to compensate Plaintiff and the Classes and to remedy the Defect.

## JURISDICTION AND VENUE

11.    At all relevant times, as alleged below, each Defendant herein was authorized to (and did) conduct business within each state and territory of the United States and supplied its products to Class Members in said states and territories, including Alabama. Each Defendant received financial benefit and profits as a result of designing, manufacturing, testing, marketing, distributing, importing, and selling defective fuel injectors and/or Class Vehicles fitted with the defective components, either directly or through a subsidiary or agent, within each state and territory of the United States, including Alabama.

12.    Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(a) and (d), because Plaintiff and Class Members are citizens of a state different than Defendant's home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

13.    Subject matter jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiff's Magnuson-Moss Warranty Act claim arises under

3

federal law, and this Court has supplemental subject matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of actions giving rise to these claims occurred in this District, as Hyundai manufactured many, if not all, of the Class Vehicles and Engines in this District, Hyundai placed the defective Class Vehicles and Engines into the stream of commerce from this District, critical witnesses and evidence reside in this District, and Hyundai is a resident of this District under 28 U.S.C. § 1391(c)(2) by owning land and operating a manufacturing plant in this District, among other things. Venue is also proper in this District pursuant to 18 U.S.C. § 1965.

15.    This Court has personal jurisdiction over Hyundai pursuant to Alabama Rule of Civil Procedure 4.2 for the following reasons.

16.    This Court has personal jurisdiction over Hyundai under Alabama Rule of Civil Procedure 4.2 because, as described below, Hyundai, at all relevant times, had minimum contacts with Alabama, Hyundai purposefully availed itself to the privilege of doing business in Alabama, Plaintiff's and the Class Members' claims arise out of and relate to Hyundai's Alabama contacts, and exercising jurisdiction over Hyundai does not offend traditional notions of fair play and substantial justice.

4

17.     Hyundai, itself and/or through its subsidiaries or agents, transacts substantial business within the State of Alabama, obtains substantial revenue in Alabama, including by manufacturing, marketing, and selling the Class Vehicles and other products in Alabama and providing repair services related to the Class Vehicles in Alabama.

18.     Hyundai, itself and/or through its subsidiaries or agents, owns and operates a manufacturing plant in Montgomery, Alabama which employs more than 3,400 people in a 3.4 million square foot facility.

19.     Hyundai's $1.8 billion facility in Alabama is Hyundai's first and only U.S. manufacturing plant.[3]

20.     On May 20, 2005, during the grand opening of Hyundai Motor Manufacturing Alabama, Chung Mong-koo, chairman and CEO of Hyundai Kia Automotive Group, emphasized that the "plant will enable [Hyundai] to better serve them."[4]

---

[3] https://www.hmmausa.com/our-company/about-hmma/#fact-sheet (last visited August 18, 2025).
[4] *Id*.

21.    At its Montgomery, Alabama plant, Hyundai manufactures approximately 358,000 vehicles, including most, if not all, Class Vehicles and Engines, a year.[56]

22.    Hyundai test drives most, if not all, Class Vehicles and Engines in Alabama after they are manufactured and before they are distributed across the country for sale or lease.

23.    After the test drive, Hyundai ships and places into the stream of commerce most, if not all, Class Vehicles and Engines from Alabama.

24.    Upon information and belief, most, if not all, of the Class Vehicles' parts replaced at dealerships under warranty, including fuel injectors, are first returned to Hyundai's plant in Alabama.

25.    Hyundai, itself and/or through its subsidiaries or agents, operated at all relevant times approximately 23 Hyundai branded and 19 Kia branded dealerships in Alabama at which agents marketed, sold, and serviced Class Vehicles to other Class Members without disclosing material facts, made material omissions and/or misleading statements and continue to do so, which damaged and continues to damage Class Members in Alabama and elsewhere, as alleged herein.

---

[5]  https://www.hmmausa.com/our-company/about-hmma/ (last visited August 18, 2025).
[6]  https://www.hyundaimotorgroup.com/tag/1411 (last visited August 18, 2025)

26.     Hyundai, itself and/or through its subsidiaries or agents, disseminated and continues to disseminate television, radio, print, social media, and other forms of promotional and marketing materials from and/or in Alabama, including material touting its Class Vehicles. Through these various media outlets, Hyundai, itself and/or through its subsidiaries or agents, disseminated statements that omitted material facts, made material omissions and/or misleading statements and continues to do so, which damaged and continues to damage Class Members in Alabama and elsewhere, as alleged herein.

27.     Hyundai knew or should have reasonably known that Hyundai vehicles that were defectively designed and/or manufactured inside of Alabama would be marketed and sold outside Alabama and would require repairs outside Alabama.

28.     Hyundai derives substantial revenue from interstate and international commerce. Ala. Code § 18-9-5. For the fiscal year ended 2024, Hyundai Motor Company had net revenues of $125 billion.[7]

29.     Hyundai, itself and/or through its subsidiaries or agents, has sufficient contacts with the State of Alabama such that exercising jurisdiction over Hyundai is reasonable and comports with due process. Thus, this Court has jurisdiction over

---

[7] https://www.hyundai.com/worldwide/en/newsroom/detail/hyundai-motor-announces-2024-annual-and-q4-business-results-0000000897#:~:text=2024%20annual%20vehicle%20sales%20decreased,percent%20to%20KRW%20175.2%20trillion  (last visited August 19, 2025).

Hyundai under Alabama Rule of Civil Procedure 4.2, which extends to the limits of the United States Constitution.

**THE PARTIES**

<u>**Plaintiff**</u>

30.    Plaintiff Alexandra Lopex is a citizen of Georgia and resides in Alpharetta, Georgia.

31.    Plaintiff Lopez owns a 2022 Hyundai Tucson which she purchased new from Rick Case Hyundai of Roswell in Roswell, Georgia on July 3, 2021. Plaintiff's vehicle was manufactured in, and shipped from, Alabama.

32.    Prior to purchasing her Class Vehicle, Plaintiff Lopez reviewed Hyundai's promotional materials and interacted with at least one sales representative without Hyundai disclosing the Defect.

33.    Through her exposure and interaction with Hyundai, Plaintiff Lopez was aware of Hyundai's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase her Class Vehicle. When she purchased the vehicle, she believed, based on Hyundai's marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Lopez purchased her vehicle did Hyundai disclose to her that her vehicle

was not safe or dependable, or that it was equipped with a defective fuel delivery system.

34.    The Defect creates an unreasonable risk of injury to Plaintiff Lopez, Class Vehicle occupants, and others on the road.

35.    While operating on public roads on May 30, 2025, Plaintiff's Engine shook from misfire, lost motive power, and entered a computer directed reduced power mode. The next day, Plaintiff presented her Class Vehicle to Rick Case Hyundai for repair, which diagnosed a failed fuel injector at approximately 36,682 miles. Plaintiff Lopez's Class Vehicle was not repaired until a later date due to part shortages. At the direction of Hyundai, Rich Case Hyundai replaced all four fuel injectors following TSB 25-FL-001H.

36.    Hyundai's TSB 25-FL-001H repair was not successful as Plaintiff's Class Vehicle continues to exhibit similar symptoms.

37.    Plaintiff Lopez did not receive the benefit of her bargain. She purchased a vehicle of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Defect has significantly diminished the intrinsic and resale value of Plaintiff Lopez's Class Vehicle.

38.    Had Hyundai disclosed the Defect, Plaintiff Lopez would not have purchased her Class Vehicle or would have paid less to do so.

9

39.    Plaintiff Lopez would purchase a vehicle from Hyundai in the future if Defendant's representations about the vehicle, including its safety and durability, were accurate.

**Defendants**

**A.    Hyundai Motor America, Inc.**

40.    Defendant Hyundai Motor America, Inc. ("HMA") is a corporation organized and in existence under the laws of the State of California and registered to do business in the State of California. HMA is headquartered in Fountain Valley, California and is a wholly owned subsidiary of HMC.

41.    HMA is responsible for sales, marketing, service, distribution, import and export of Hyundai branded products, including vehicles and parts, in the United States. HMA is also the warrantor and distributor of Hyundai vehicles, including the Class Vehicles, throughout the United States.

42.    In order to sell vehicles to the general public, HMA enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiff. In return for the exclusive right to sell new Hyundai branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties HMA provides directly to consumers who purchased new vehicles from the authorized dealerships. All service and repair at an authorized

10

dealership is completed according to Hyundai instructions, issued through service manuals, TSBs, and other documents.

43. Per the agreements between HMA and the authorized dealers, consumers such Plaintiff are able to receive services under HMA's issued warranty at dealer locations that are convenient to them. These agreements provide HMA with a significant amount of control over the actions of the authorized dealerships. For example, HMA employees are appointed as managers for particular regions of the United States and their responsibilities include managing the day-to-day operations of the dealerships located within their region.

**B.** **Hyundai Motor Company**

44. Defendant Hyundai Motor Company ("HMC") is a corporation founded in 1967 under the laws of South Korea and headquartered in Seoul, South Korea.

45. HMC designs, engineers, manufactures, tests, markets, supplies, sells, and distributes Hyundai-branded vehicles and parts for those vehicles worldwide, including the United States, as well as manufactures parts for Kia branded vehicles. HMC also receives parts manufactured by Kia Motor Company for use in Hyundai-branded vehicles.

46. HMC is the parent corporation of HMA, as well as the United States based Hyundai facilities, including manufacturing in Alabama and the technical

campus in Michigan. For all its United States subsidiaries, including HMA, HMC provides all the technical information for the purposes of manufacturing, servicing, and repairing the Class Vehicles

47.     Discovery will show the decision to found HMA in California and register it as a California corporation was made by HMC.

48.     Discovery will also show that the relationship between HMA and HMC is governed by an agreement that gives HMC the right to control nearly every aspect of HMA's operations, including sales, marketing, management policies, technical information, servicing instructions, governance policies, pricing, and warranty terms.

## C.     Hyundai Motor Manufacturing Alabama LLC

49.     Hyundai Motor Manufacturing Alabama LLC ("HMMA") is a limited liability company organized under the laws of Delaware, with its principal place of business located at 700 Hyundai Boulevard, Montgomery, Alabama 36105.

50.     Vehicles assembled at HMMA's Montgomery, Alabama facility, including the Class Vehicles, enter the market from Alabama and are distributed across the United States and to select global destinations. The plant functions as an important point for Hyundai's distribution and supply chain, facilitating the transport of finished vehicles to dealerships nationwide. Alabama serves as a primary entry point for these vehicles into the automotive marketplace.

51.     Moreover, since opening its doors in Montgomery, Alabama in 2005, HMMA has grown into one of the largest employers in the region, offering thousands of skilled jobs and collaborating closely with local suppliers and businesses. The company's sprawling manufacturing facility stands as a testament to its on-going presence in Alabama.

52.     Beyond its economic impact, HMMA has woven itself into the community by supporting local initiatives, sponsoring events, and contributing to educational and charitable programs.[8] HMMA website touts these charitable giving and reaffirms that its "mission is to provide responsible stewardship to our community."[9]

53.     Operating in close coordination with both HMA and HMC, HMMA manufactures vehicles tailored for the U.S. market, strictly adhering to specifications and requirements established by HMC and communicated through HMA. The facility serves as the cornerstone of Hyundai's U.S. manufacturing strategy and is considered an alter ego and mere instrumentality of HMA, functioning under direct managerial and operational supervision. With its enduring presence, local

---

[8] https://www.hmmausa.com/community-relations/charitable-giving/ (last visited August 18, 2025).
[9] *Id*.

13

engagement, and ongoing commitment to the local economy, HMMA is truly "at home" in Alabama.

## I.    FACTUAL ALLEGATIONS

### A.    <u>System Operation and the Defect</u>

54.    Fuel injectors are delicate components comprised of several key parts that work together to spray fuel directly into the engine. The main body holds everything together. Inside, there's a needle that opens and closes to let fuel through a nozzle, which sprays the fuel in a fine mist. A spring helps push the needle back into place after each spray. There are also small parts like a pin and washer that help keep everything aligned and sealed. The injector is powered by an electrical coil or actuator, which receives signals from the engine's computer to control when and how much fuel is sprayed. All these parts are tightly sealed to handle the high pressure needed for direct injection.

55.    The below image shows a dismantled GDI fuel injector, with each major component labeled as follows: a) core body 1, b) core body 2, c) injector nozzle, d) injector needle, e) pin, f) washer, and g) spring.



56.    The injector regulates the flow of fuel into the combustion chamber by opening and closing the needle and seat gap, allowing for accurate metering of fuel delivery under high pressure.

57.    Healthy injectors deliver properly atomized fuel at the intended time and volume, while rapidly adapting to changes in engine load and RPM.

58.    Partial or incomplete injector closing will cause fuel to leak into the combustion chamber, resulting in fuel waste, oil dilution, and higher emissions.

59.    Fouled or contaminated injectors will not deliver fuel at the intended specifications for atomization, volume, and timing.

15

60.    Engine sump oil that enters the combustion chamber, or fuel that is partially burned, converts to carbon and collects on the combustion chamber surfaces, including the GDI fuel injector tip.

61.    Carbon buildup interferes with piston ring compression and oil control, quality of combustion, and power output, eventually resulting in Engine disablement.

62.    Fuel injectors require a filter to screen out fuel particles.

63.    The filter is exposed to fuel particles and the extreme heat and carbon deposits generated from combustion.

64.    Once the filter is compromised, rough idle and acceleration, loss of torque, misfires, and engine damage result. A compromised filter will also cause irregular fuel spray patterns, timing, and volume, compounding the risk of carbon buildup.

65.    Injector durability is dependent on other Engine parts performing according to Hyundai's design specifications. The Engine parts must work in harmony to withstand the intense pressures, temperatures, and chemical and physical stresses inherent to combustion.

66.    The Class Vehicles' injectors, however, cannot tolerate the environment within Hyundai's Engines.

67.    Instead, the GDI fuel injectors prematurely fail due to carbon build up

16

and contamination, oil dilution, incomplete combustion, crankcase over pressurization, excessive blowby gasses, PCV pullover, aggressive compression ratio, excessive heat, pre-ignition, early detonation, and premature piston ring and other component wear, among other things, and as described herein (i.e., the "Defect").

68.    Many Class Members have reported fuel injector failures caused by the Defect, as reflected by following NHTSA complaints, which Hyundai monitors pursuant to the TREAD Act.

69.    For example, on January 22, 2023, the owner of a 2022 Hyundai Sonata submitted the following complaint:[10]

> My 2022 hyundai sonata sel completely shuts down while driving, most recently it happened twice in the middle of an intersection when I was trying to make a left turn it is very very scary and dangerous. I purchased the vehicle in July 2022 and since then it has had consistent idling issues meaning if it's parked too long it will just turn off but now it is turning into while I'm actually driving at the engine dies and again recently it's been in the middle of intersections which is very scary. My check engine light came on it only 4000 miles on new car - very concerning. I encourage anyone having intermittent engine stalling in any way to make sure we are reporting this.

70.    On February 14, 2023, the owner of a 2022 Hyundai Sonata submitted the following complaint:[11]

> The contact owns a 2022 Hyundai Sonata. The contact stated that while driving approximately 35 MPH up a ramp leading to the freeway, the

---

[10] NHTSA ID: 11503065
[11] NHTSA ID: 11507159

vehicle suddenly started losing motive power. The contact stated that the vehicle would no longer accelerate while depressing the accelerator pedal. The vehicle was later towed to the local dealer who was unable to determine the cause of the failure. The vehicle was not repaired. The manufacturer was not made aware of the failure. The failure mileage was 15,000.

71.    On November 21, 2023, the owner of a 2022 Hyundai Tucson submitted the following complaint:[12]

> For the second time vehicle has lost power and slowly began slowing down. This time it was on the interstate which almost caused a collision with a semi. It is due to faulty fuel injectors which is a known issue with hyundai.

72.    On July 30, 2024, the owner of a 2022 Hyundai Santa Cruz submitted the following complaint:[13]

> On 6/22/24 I had issues with my car not picking up speed and shaking while driving a major freeway. The same day I had an issues starting the car. When it finally started the engine light came on with a notice on my screen. Dealership replaced fuel injector. Stating that was the problem. Again, on 7/27/24 the same issues happened. Another fuel injector replaced by dealship. The car is 2 and half years old, under 30,000 miles. 2 of my fuel injector have been replaced. I do not feel safe for other drivers and myself driving the freeway with the hyundai santa cruz. Due to the fuel injectors that randomly keeps giving out. They replace 1 at a time. I feel like hyundai is waiting for a big accident before they replaced all of them. There are multiple complaints that I have seen regarding this problem. They need to be investigated thoroughly, people's lives are in danger. I don't know much about vehicles, but if a car continues to stall, vibrate and stop at anytime it will cause an accident.

---

[12] NHTSA ID: 11556172
[13] NHTSA ID: 11605304

73.    The above NHTSA complaints reflect a sample of those submitted to NHTSA.

74.    Hyundai also admitted the Defect by issuing four TSBs, which confirm internal GDI injector leaks.

75.    The TSBs direct dealerships to replace the injectors with unimproved components, which do not remedy the underlying Defect, as the Class Vehicles still accumulate carbon buildup and other contaminants and are still subject to the Engine's damaging environment.

76.    Class Members reported repeat failures to NHTSA. For example, on March 27, 2025, the owner of a 2022 Hyundai Tucson submitted the following complaint to NHTSA:[14]

> September 15, 2024 while driving with cruise control set at 65mpg, the 2022 Hyundai Tucson began shaking and experienced an abrupt loss of power. I released the cruise control, and the vehicle wouldn't accelerate over 45 mph without shaking severely. September 16, 2024 car was inspected by a dealership and determined it was the 4th cylinder fuel injector; mileage on the vehicle was 45,314. Repairs were made per a TSB P030X. January 27, 2025, while driving with cruise control at 60mph, the same thing happened again. Managed to get the car to another dealership, only to find out all 4 fuel injectors needed to be replaced; this time with a TSB 25-FL-001H kit; mileage was 50181. Approximately March 11, 2025 car started the same issue, only this time there was no abrupt shaking or loss of power, however very strong smell of fumes. I refused to park the car in my garage, and immediately called Hyundai USA with all of this information from the start of these issues until current. The car was then taken to another dealership with

---

[14] NHTSA ID: 11651150.

mileage at 51332, only a difference of 1151 miles since last issue. This time all of the fuel injector seals are melted. Hyundai USA refuses to do anything about it. It was verified with the service technician this last time, that raw fuel was leaking onto the hot engine and could have resulted in the car catching on fire. The first two times this happened, I was out of state while being broken down.

77.    On May 16, 2025, the owner of a 2022 Hyundai Santa Cruz submitted

the following complaint to NHTSA:[15]

I purchased my 2022 Hyundai Santa Cruz new from Hallmark Hyundai in Tennessee. Ever since the purchase of my Hyundai Santa Cruz I have had issues with fuel injectors. I have had two fuel injector failures that had to be covered under warranty, the last fuel injector that failed under warranty was on cylinder 3 and was replaced a year ago at Coastal Hyundai in Melbourne, Florida. Three weeks ago, the fuel injector failed again on cylinder 3 and Is'not covered under warranty. This makes the third fuel injector (two on the same cylinder) to have failed in the three years of owning my vehicle. With less than 80,000 miles on it. Hyundai knows it's a problem as they recently changed their service bulletin mandating all four fuel injectors to be replaced with an upgraded part. However they wont cover the charges and I'm on the hook for the bill. Also, the new upgrade kit is on back order. I've been given three dates know for when it was supposed to be in stock, but they moved the date out again to May 25 and they're not confident that it will be here then. There needs to be a recall ordered for the fuel injector replacement as Hyundai knows it's a problem. There are over 3,000 customers waiting across the country for this new upgraded part.

78.    On May 18, 2025, the owner of a 2022 Hyundai Tucson submitted the

following complaints to NHTSA:[16]

Car keeps jerking also it's something going on with the fuel injections I've had to get them replaced twice. Please help

---

[15] NHTSA ID: 11661401.
[16] NHTSA ID: 11661682.

20

79.    On May 30, 2025, the owner of a 2022 Hyundai Tucson submitted the

following complaint to NHTSA:[17]

> I purchased a 2022 Hyundai Tucson brand new, expecting it to be a
> reliable and safe vehicle for many years. Unfortunately, the fuel
> injectors failed and had to be replaced far too early in the car's life.
> What component or system failed or malfunctioned, and is it available
> for inspection upon request? The fuel injection system failed. The
> injectors had to be replaced, and the problem persists even after the
> repair. I believe the issue may still be present and can be made available
> for inspection if needed. How was your safety or the safety of others
> put at risk? The vehicle continues to run poorly and unpredictably,
> which puts me and my family at risk-especially while driving at higher
> speeds or in heavy traffic. I'm concerned about stalling, power loss, or
> a potential engine fire due to leaking fuel. Has the problem been
> reproduced or confirmed by a dealer or independent service center?
> Yes, the issue was diagnosed and confirmed by the dealership, and the
> fuel injectors were replaced. Despite this, the engine still doesn't
> perform correctly. Has the vehicle or component been inspected by the
> manufacturer, police, insurance representatives, or others? The vehicle
> was inspected by the dealership during service, but not by police, the
> manufacturer directly, or insurance representatives. Were there any
> warning lamps, messages, or other symptoms of the problem prior to
> the failure, and when did they first appear? Yes, there were signs of
> rough idling, engine hesitation, and overall poor performance before
> the failure. These symptoms started appearing within the first year of
> ownership. I have since learned that many other owners of 2022
> Hyundai Tucsons are experiencing the same issue. I believe this is a
> widespread defect that poses a safety concern and needs urgent
> investigation.

80.    On June 11, 2025, the owner of a 2022 Hyundai Sonata submitted the

following complaint to NHTSA:[18]

---

[17] NHTSA ID: 11658012.
[18] NHTSA ID: 11666438.

First owner, sporadic acceleration problems reported from approx 6k miles. Documented with dealership.. "couldn't reproduce" issue every time I brought it in after an occurrence. Dangerous when entering highway, as I never knew when it would fail/stall. Eventually broke down on busy interstate highway, replaced 1 fuel injector, and guilt tripped me into "needing" to have fuel injector cleaning because the others might fail as well. 27k miles was the first breakdown. 38k was the second breakdown and almost caused a serious accident when I was unable to accelerate. Replacing all 4 fuel injectors but not covering the oil change due to their faulty fuel injectors.

81.     The above NHTSA complaints reflect a sample of those submitted to NHTSA.

## II.    HYUNDAI'S KNOWLEDGE OF THE DEFECT AND ASSOCIATED SAFETY RISK

82.     Hyundai became aware of the Defect through sources not available to Plaintiff and the other members of the Classes, including, but not limited to: pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to Hyundai's network of dealers and directly to Hyundai, aggregate warranty data compiled from Hyundai's network of dealers, testing conducted by Hyundai in response to consumer complaints, repair order and parts data received by Hyundai from Hyundai's network of dealers and suppliers, its investigation and field analysis of the Defect; and its investigation and root cause analysis of failures in pre-Class Vehicles.

A.    **Pre-Release Testing**

83.    Prior to the sale of any of the Class Vehicles, Hyundai completed a multitude of analyses and testing that exposed the existence of the Defect.

84.    Hyundai and its suppliers, performed various pre-production testing on the Class Vehicles, including most notably Failure Modes and Effects Analysis ("FMEA") and Design Validation Plan and Report ("DVP&R").

85.    FMEA tests methods or modes by which a particular component might fail. It examines the design of each component, the assembly of the part, and whether use in various manners would cause the part or system to fail.

86.    For example, in testing the systems at issue here, FMEA testing would explore, among other things, how and under what conditions the Engine and its components could fail, how likely failure was under different conditions, and how likely each condition tested was to occur.

87.    The purpose of the FMEA is to define, based on known and established engineering facts like those asserted by Defendant, potential risks of failures and rank them by severity, likelihood and ability to detect failure. Any conditions resulting in failure, like those associated with the Defect would result in a "high risk" priority and draw additional and more extensive analysis and validation testing during the FMEA and DVP&R phases.

23

88.     Given the reports of Engine failures after sale, these processes were designed to show the various modes of failure caused by the Defect and confirm what Defendants already knew about the Defect.

89.     The DVP&R phase includes an extensive battery of tests and other work necessary to validate the robustness of any design and includes three basic types of testing: bench scale, dynamometer, and vehicle/field testing. This testing is discussed below.

90.     Bench scale testing is component-specific and establishes a strict set of specifications and guidelines to ensure that the component will operate reliably and durably in foreseeable operating conditions. During this phase of testing, Defendants' Engine was "bench tested," that is, set up on various machinery to simulate certain operating extremities and conditions to confirm whether it meets the necessary specifications and guidelines set by the supplier in coordination with Defendants.  Discovery is expected to reveal that Defendants received the detailed results of the bench testing and resulting Technical Control Documents (TCDs) which outline the operating limitations of Defendants' Engine along with the potential risks associated with installation in the Class Vehicles, including the Defect.  Similarly, discovery is expected to show that bench testing of the Engines confirmed what Defendants already knew about its design choice or its workmanship and materials—that the Engines fail to operate as intended and prematurely fails.

24

91.    Dynamometer testing is one of the most important types of testing to ensure durability and performance of the powertrain and its components. In the dynamometer test, the powertrain operates under extreme conditions such as maximum temperatures, RPMs, or excessive vibration. Dynamometer testing is intended to demonstrate powertrain robustness and reveal necessary improvements or flaws, such as the Defect.

92.    Hyundai and its suppliers also performed computer and real-world simulations of the systems, including in extreme conditions, to confirm they are meeting the design goals. Hyundai tested the Engines in actual vehicles, both prototype vehicles and pre-production line vehicles. In these tests, vehicles are driven through a full range of conditions and extremities that are encountered once a vehicle is sold to the public. These vehicle-specific development tests include mapping extreme operating conditions, which are the kinds of modes that manifest the Defect.

93.    Through the rigors of these three phases of DVP&R testing, Defendants' Engines were exposed repeatedly to conditions that cause the Defect to manifest.

94.    Defendants admit they perform extensive pre-release testing of the Class Vehicles before they are sold.

95.    Among other things, Hyundai's testing demonstrated (1) the sealing performance required for the Class Vehicles' injector to operate correctly, (2) the effects of external contaminants on fuel injectors, (3) the limitations of the filtration system in preventing particles accumulation, (4) the injectors' inability to maintain proper fuel delivery under compromised conditions, and (5) the resulting engine damage and performance issues associated with the Defect.

96.    Hyundai knew or should have known that the Defect was material to owners or lessees of the Class Vehicles and that Plaintiff and Class Members could not reasonably discover the Defect on their own prior to purchasing or leasing the Class Vehicles.

97.    Hyundai had and continues to have a duty to fully disclose the true nature of the Defect to Plaintiff and Class Members, among other reasons, because the Defect poses an unreasonable safety hazard; because Hyundai had and has exclusive knowledge or access to material facts about the Class Vehicles' Engines that were and are not known to or reasonably discoverable by Plaintiff and the other members of the Classes; and because Hyundai has actively concealed the Defect from its customers at the time of purchase or repair and thereafter.

98.    Specifically, Hyundai (a) failed to disclose, at the time of purchase or repair and thereafter, any and all known material defects or material nonconformities of the Class Vehicles, including the Defect; (b) failed to disclose, at the time of

26

purchase or repair and thereafter, that the Class Vehicles and their Engines were not in good working order, were defective and prone to failure, and were not fit for their intended purpose; and (c) failed to disclose and actively concealed the fact that the Class Vehicles and their Engines were defective, despite the fact that Hyundai learned of the Defect before it placed the Class Vehicles in the stream of commerce.

99.    The Defect and its associated safety risks were concealed and actively suppressed in order to protect Hyundai's corporate profits from loss of sales, purchase refunds, warranty repairs, adverse publicity, and brand disengagement. Consumers were misled into believing their Class Vehicles had different qualities than what they purchased or leased, and as a result, were deprived of economic value, the benefit of their bargain, and overpaid for their Class Vehicles.

**B.    NHTSA Complaints**

100.    Pursuant to the TREAD Act, Hyundai is required to monitor complaints. Hyundai does in fact employ people who monitor NHTSA complaints and other publicly available information, for vehicle defects.

101.    By monitoring the complaints, Hyundai learned about the Defect through complaints submitted as early as 2020.

27

102.   For example, On November 27, 2020, the owner of a 2020 Hyundai Sonata submitted the following complaint to NHTSA:[19]

> AS THE VEHICLE WAS AT A COMPLETE STOP AND WAITING FOR A CHANCE TO GET IN TRAFFIC, THE CAR HESTIATED AND WOULD NOT RESPOND TO THE DEPRESS OF THE GAS PEDAL, FOR A SECOND OR TWO... VERY STRANGE INDEED!....IS IT A TRANSMISSION ISSUE OR SOMETHING ELSE....THE TRANSMISSION SHIFTS STRANGE FROM THE COMPLETE STOP POSITION...THIS HAPPENES MORE THAN ONCE! AND ONE INSTANCE IT ACTUALLY JERKED ( BUCKED) SOMEHOW...CONCERNED ABOUT THIS...

103.   On January 2021, the owner of a 2020 Hyundai Sonata submitted the following complaint to NHTSA:[20]

> OCCASIONALLY THERE IS A SERIOUS DELAY WHEN TRYING TO ACCELERATE. CAR TENDS TO JERK/BUCK WHEN ACCELERATING, USUALLY IN THE LOWER GEARS. I HAVE NO IDEA IF THIS IS A TRANSMISSION ISSUE OR A FUEL INJECTION ISSUE, BUT MY DEALERSHIP HAS NOT BEEN ABLE TO DETECT AN ISSUE AND KEEPS TELLING ME EVERYTHING IS NORMAL WHEN IT CLEARLY ISN'T. THE CAR ALSO HAS HARSH DOWNSHIFTS ESPECIALLY GOING FROM 2ND TO 1ST GEAR.

104.   On July 30, 2021, the owner of a 2021 Hyundai Santa Fe submitted thew following complaint to NHTSA:[21]

> Vehicle stalled 5 times when finally got it to restart wouldn't accelerate more than two mph. Broke down on a busy road was finally able to get the car into a parking lot but was almost hit from behind cause the vehicle was obstructing traffic. Towed to dealership where was told it

---

[19] NHTSA ID: 11376745.
[20] NHTSA ID: 11386446.
[21] NHTSA ID: 11427111.

would take them a week to look at it and they won't provide any alternative transportation for me that I would have to pay out of pocket. My car is only 2 months and 2400 miles old.

105.    On May 7, 2022, the owner of a 2021 Hyundai Santa Fe submitted the following complaint:[22]

This vehicle hesitates to a dangerous degree when trying to accelerate from a stop or rolling stop. When pressure is applied to the gas pedal, the vehicle will not accelerate until nearly a whole second later. This delay in response has created dangerous situations where merging onto a road in a predictable and smooth manner is crucial (i.e. turning right at a red light, a 4-way stop). I did not notice this problem during my test drive, but now at almost 10,000 miles, the problem has become more pronounced. No warning messages in the gauge display. The vehicle has not been inspected by police, manufacturer, or insurance representative.

106.    On July 25, 2022, the owner of a 2022 Hyundai Santa Cruz submitted the following complaint:[23]

During the 6 months since I've purchased this vehicle, the power has intermittently, stalled upon pulling off from a traffic light, or excellerating onto the freeway, or while turning and pulling up onto a supermarket's parking lot. It revs up loudly, but without any power nor excelleration, without any warning. I'm always afraid that someone will run into my rear end because drivers behind me have no way of knowing that my car has suddenly stopped being able to excellerate. It keeps making the loud noise as if it's no longer in Drive, or the right gear as I'm pressing down on the excellerator peddle. It does this for approximately 10 seconds each time that it has happened. Had car in for service, first maintenance appointment, and for them to find out what's causing the transmission to keep failing, and to correct it, last Thursday, on 7/21/22. I was told that everything checked out okay, and that they drove the car, and couldn't reproduce the transmission

---

[22] NHTSA ID: 11463716
[23] NHTSA ID: 11475623

problem that I've been having. Well, everything is clearly not okay, whether it's intermittent or not. This is very dangerous, but unfortunately, I can't will this to happen at any specific time, that I'm able to get a service appointment, in order for it be reproduced by the technician. I left the dealership with no resolution to my most important reason for scheduling the service appointment. I left with an oil change, tire rotation, a fluid level top off, but was notified that now, I had a screw in one of my tires. Then, the very next day, I experienced it happen again. I'm very concerned, each time I drive my new car, about the potential for this sudden loss of power. This is extremely unsafe, scary, and anxiety producing. I should be enjoying my new car. I've searched Santa Cruz owners forums and other sites, to see if other owners are experiencing the same, or similar problems with their vehicle. Some say they've reported the concerns to dealership and to the manufacturer, with no response. Please help!

107.   On August 3, 2022, the owner of a 2022 Hyundai Santa Fe submitted

the following complaint:[24]

The contact owns a 2022 Hyundai Santa Fe. The contact stated that while driving at an undisclosed speed, the vehicle lost motive power with the check engine and oil warning lights illuminated. The vehicle was towed to the dealer where it was diagnosed that there was 1/3 amount of water in the fuel tank, causing damage to the fuel injector. The dealer informed the contact that the fuel injector needed to be replaced; however, the part was not covered under warranty. The vehicle was not repaired. The contact stated that she had received a copy of the state inspection notice that it had passed for clean fuel from the gas station where she refueled. The manufacturer was made aware of the failure and a case was opened. The failure mileage was approximately 11,000.

108.   On October 4, 2022, the owner of a 2021 Hyundai Santa Fe submitted

the following complaint:[25]

---

[24] NHTSA ID: 11477421
[25] NHTSA ID: 11487859

While driving on the highway, when I pushed on gas pedal the car would not accelerate, I was uncertain if I was losing power of the vehicle, luckily it maintained the current speed and did not decelerate,but I was unsure at the moment if I was losing complete power, because it wasn't responding, it felt like the car was going to stall similar to when you run out of fuel. This occured for around 20 seconds, i would guess, long enough to notice that the car was not responding and continued to not respond,and to be concerned from a safety perspective. The night before I had filled the fuel tank and I noticed to guage that predicts fuel mileage kept changing by 3-5 miles difference,back and forth repeatedly, before I even left the fueling station and as I continued to drive. I'm unsure if that is related to the driving performance issue of not accelerating the next day. The next morning when the non acceleration occurred the predicted fuel mileage was consistent. The next time I drove the vehicle following the non accelerating issue, there was an error that popped up on my digital dash stating "A possible condition with your engine control system has been detected. A full system check is recommended to be done when convenient. Please contact your local dealership to schedule an appointment." Also, the check engine light came on. MyHyundai app showed a DTC - P040B00, DTC system - powertrain, DTC sub system- EMS. I took the vehicle to the Hyundai dealership to confirm that the car was safe to drive or if I should rent a car until it can be further inspected. They read the codes and said it is safe to drive and no additional information, I will be taking the car back to the dealership in a week, which is their first available appointment with a hybrid certified technician. Both the dealership and Hyundai corporate customer service states there are no current recalls, but through other car forums, it appears to be a similar issue that has occurred with other Hyundai models.

109.   On November 16, 2022, the owner of a 2022 Hyundai Sonata

submitted the following complaint:[26]

The contact owns a 2022 Hyundai Sonata. The contact stated that while her husband was driving at an undisclosed speed, the vehicle hesitated to accelerate while the accelerator pedal was depressed. The vehicle

---

[26] NHTSA ID: 11493762

was taken to the dealer; however, the dealer was unable to duplicate the failure. The vehicle was not repaired and remained at the dealer. The manufacturer was not made aware of the failure. The contact related the failure to NHTSA Campaign Number: 22V746000 (Power Train) however, the VIN was not included in the recall. The failure mileage was approximately 3,800.

110.  On November 29, 2022, the owner of a 2022 Hyundai Sonata

submitted the following complaint:[27]

Car sometimes does not accelerate appropriately. Car needs to be shut off and restarted when this happens. Dealerships around me say they don't see anything wrong with the car. It happens randomly and shouldn't happen with a brand new car. I feel unsafe when it doesn't accelerate correctly.

111.  The above complaints represent a sample of those submitted to

NHTSA.

## C.    **Warranty Data**

112.  Hyundai also knew about the Defect from its warranty data. Per the

TREAD Act, Hyundai tracks customer complaints, vehicle diagnoses, and repairs

from dealership technicians in a single, aggregated database. Hyundai employs

persons who monitor the database for repair trends, and engineering and

management staff review such trends in regular meetings. For every one complaint

filed with NHTSA, Hyundai likely receives hundreds or thousands of related

warranty claims.

---

[27] NHTSA ID: 11495315

113.   Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analyses, early consumer complaints made to Defendants' network of exclusive dealers, aggregate warranty data compiled from those dealers, repair order and parts data received from the dealers, consumer complaints to NHTSA, public consumer complaints made online, and the testing performed in response to the consumer complaints, Hyundai knew the Defect was present in all Class Vehicles, but it has not disclosed the Defect or provided an adequate repair to all Class Vehicles.

### D.    Hyundai's Manufacturer Communications Related to the Defect

114.   Hyundai failed to implement a meaningful remedy for the Class Vehicles. Instead, Hyundai issued a series of Technical Service Bulletins instructing dealerships to replace faulty fuel injectors with new units bearing the same part number, 35310-2S000. This repetitive repair approach did not address the root cause of the problem, as evidenced by ongoing complaints from Plaintiff and Class Members, and persistent reports to NHTSA and other channels.

115.   In October 2022, Hyundai issued Technical Service Bulletin ("TSB") 22-FL-002H titled "MISFIRE DTC (P030X) – INTERNAL GDI INJECTOR LEAK REPAIR" concerning the Defect. The bulletin acknowledged that 21-22MY Sonata, Santa Fe, and 22MY Santa Cruz and Tucson Class Vehicles equipped with 2.5L GDI engines suffered from the Defect, i.e., the vehicles experienced "misfires . . . due to

33

internally leaking GDI injector(s)." The bulletin instructed Hyundai dealerships to replace any affected fuel injector with one bearing a part number 35310-2S000QQH.

116.   In March 2023, Hyundai issued another bulletin, TSB 23-FL-002H, in which it updated the previously issued TSB 22-FL-002H by expanding the range of vehicles afflicted by the Defect. In its updated bulletin, Hyundai continued to instruct dealerships to replace any affected fuel injector with one bearing the part number 35310-2S000QQH.

117.   In June 2023, Hyundai updated TSB 23-FL-002H and issued TSB 23-FL-002H-1 in which it once again further expanded the range of vehicles afflicted by the Defect. Hyundai's diagnosis and repair instructions for the Defect remained the same: replace affected injector with one bearing the part number 35310-2S000QQH.

118.   In January 2025, more than two years after issuing its initial bulletin concerning the Defect, Hyundai issued TSB 25-FL-001H, which superseded TSB 23-FL-002H-1. In this updated bulletin, Hyundai instructed its dealerships to replace all four fuel injectors in the Class Vehicles, even if only one injector had failed. However, the proposed repair attempt continued to use the same part, fuel injector number 35310-2S000, that Hyundai had been directing dealerships to install for over two years.

119. By persistently reusing and reinstalling fuel injectors without addressing the root cause, Hyundai failed to address the fundamental cause of the Defect.

120. This approach not only rendered each round of repairs ineffective, but also perpetuated the risk to vehicle owners, as the "new" injectors installed under these service bulletins were just as likely to develop internal leaks and cause engine misfires, stalling, or inoperability.

121. Hyundai's actions not only failed to resolve the underlying issue but also perpetuated a misleading narrative of safety and dependability, further compounding the harm to consumers who relied on those assurances. In sum, Hyundai's response amounted to little more than superficial gestures that did nothing to protect drivers or address the real threat posed by the Defect.

## III. HYUNDAI CONTINUOUSLY TOUTED CLASS VEHICLES AS SAFE AND DEPENDABLE, CONCEALING THE DEFECT

122. Hyundai directly markets, for its benefit, the Class Vehicles to consumers via extensive nationwide multimedia advertising campaigns on television, the internet, billboards, print, mailings, social media, and other mass media, which impart a universal and pervasive marketing message: safe and reliable vehicles.

123. Hyundai's marketing message is false and misleading given the propensity of the fuel injectors in the Class Vehicles to fail, causing the Class

Vehicles' Engines to run rough, stall and become inoperable which, as Hyundai admits, creates an unreasonable risk of a crash.

124.   For example, in its sales brochure for the 2022 Tucson, Hyundai touts the "more potent Smartstream 2.5L engine" as "super efficient" with an "EPA-estimate 29 combined MPG rating."[28]



125.   Hyundai specifically touted the smartstream brand as the "next generation of mobility."[29] Hyundai goes on to state its Dual Port system creates the "optimal injection pattern for every engine."[30]

---

[28] https://secure.viewer.zmags.com/publication/991587aa#/991587aa/5 (last visited July 21, 2025).

[29] https://hyundai.com.sg/global-stories/what-is-smartstream-224/ (last visited July 21, 2025).

[30] *Id.*

126.    Moreover, according to Hyundai, the smartstream brand and the Class Vehicles "live[] up to our high expectations" and "objectives of saving fuel, improving performance, and reducing gas emissions." [31]

127.    Hyundai's deceptive marketing and willful and knowing failure to disclose the Defect damaged, and continues to damage, Plaintiff and Class Members. If Plaintiff and Class Members had known of the Defect and/or that the Class Vehicles were not safe and durable, they would not have purchased or leased the Class Vehicles or certainly would have paid less to do so.

## IV.    APPLICABLE WARRANTIES

128.    Hyundai sold and leased the Class Vehicles with written express warranties.

129.    For the Hyundai branded Class Vehicles, Hyundai offered a written express basic warranty covering Hyundai brand vehicles for 5-Year/60,000 miles, covering all components (except normal wear and tear). This warranty also covers other EPA emissions warranty parts not covered under the Federal Emission Defect and Performance Warranty.

---

[31] Id.

130.   Hyundai also offers a 10-Year/100,000 powertrain warranty which covers repair or replacement of powertrain components (i.e., selected engine and transmission/transaxle components).

131.   Additionally, Hyundai offers an 8-Year/80,000 mile Federal Emission Defect and Performance Warranty, covering repair or replacement of the following original Hyundai major emissions control components, should they cause the vehicle to fail to conform to an applicable EPA-approved inspection/maintenance program: (1) Catalytic Converter; (2) Engine Control Module; and (3) Onboard Emissions Diagnostic Device (OBD-II).

132.   Hyundai gives buyers and lessees warranties after they purchase or lease a Class Vehicle. However, consumers have no say over these terms before the sale or lease.

133.   Hyundai breached these warranties by failing to fix the Defect. Even when Class Members reported the Defect to dealers, they did not receive an adequate repair, violating both express and implied warranties.

134.   Given these facts and Hyundai's ongoing failure to address the Defect, any requirement that Plaintiff use informal dispute resolution procedures or give Hyundai a chance to fix the problem is excused, since Hyundai currently has no real solution.

## V.    FRAUDULENT OMISSION/CONCEALMENT ALLEGATIONS

135.   Absent discovery, Plaintiff is unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Hyundai responsible for making false and misleading statements regarding the Class Vehicles. Hyundai necessarily is in possession of all of this information. Plaintiff's claims arise out of Defendants' fraudulent omission/concealment of the Defect, despite their representations about the quality, safety, and comfort of the Class Vehicles.

136.   Plaintiff alleges that at all relevant times, including specifically at the time she and Class Members purchased their Class Vehicle, Defendants knew, or were reckless in not knowing, of the Defect; Defendants had a duty to disclose the Defect based upon their exclusive knowledge; and Defendants never disclosed the Defect to Plaintiff or the public at any time or place in any manner other than a halfhearted, inadequate service bulletins.

137.   Plaintiff makes the following specific concealment/omission-based allegations with as much specificity as possible absent access to the information necessarily available only to Defendants:

a.    **Who**:  Defendants actively concealed and omitted the Defect from Plaintiff and Class Members while simultaneously touting the safety and dependability of the Class Vehicles, as alleged

39

herein. Plaintiff is unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Defendants responsible for such decisions.

b.   **What**:  Defendants knew, or were reckless or negligent in not knowing, that the Class Vehicles contain the Defect, as alleged herein. Defendants concealed and omitted the Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

c.   **When**:  Defendants concealed and omitted material information regarding the Defect at all times while making representations about the safety and dependability of the Class Vehicles on an ongoing basis, and continuing to this day, as alleged herein. Defendants still have not disclosed the truth about the full scope of the Defect in the Class Vehicles to anyone outside of their respective entities. Defendants have never taken any action to inform consumers about the true nature of the Defect in Class Vehicles. And when consumers brought their vehicles to Hyundai complaining of the fuel injector failures, Hyundai denied any knowledge of or repair for the Defect.

40

d.  **Where**:  Defendants concealed and omitted material information regarding the true nature of the Defect in every communication they had with Plaintiff and Class Members and made representations about the quality, safety, and comfort of the Class Vehicles. Plaintiff is aware of no document, communication, or other place or thing, in which Defendants disclosed the truth about the full scope of the Defect in the Class Vehicles to anyone outside of their respective entities. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Defendants' websites. There are channels through which Defendants could have disclosed the Defect, including but not limited to, (1) point of sale communications; (2) the owner's manual; and/or (3) direct communication to Class Members through means such as state vehicle registry lists.

e.  **How**:  Defendants concealed and omitted the Defect from Plaintiff and Class Members and made representations about the quality, safety, dependability, and comfort of the Class Vehicles. Defendants actively concealed and omitted the truth about the existence, scope, and nature of the Defect from Plaintiff and

41

Class Members at all times, even though it knew about the Defect and knew that information about the Defect would be important to a reasonable consumer, and Defendants promised in its marketing materials that Class Vehicles have qualities that they do not have.

f.  **Why**:  Defendants actively concealed and omitted material information about the Defect in the Class Vehicles for the purpose of inducing Plaintiff and Class Members to purchase and/or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles, and made representations about the quality, safety, durability, and comfort of the Class Vehicles. Had Defendants disclosed the truth, for example in its advertisements or other materials or communications, Plaintiff and Class Members (all reasonable consumers) would have been aware of it and would not have bought or leased the Class Vehicles or would not have paid as much for them.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Continuing Act Tolling

138.    Beginning in 2020, Hyundai continuously marketed and sold Class Vehicles with the defective Engines, including the defective fuel injectors to unsuspecting customers. Hyundai continuously represented the Class Vehicles as safe and dependable despite their propensity to experience rough idling, loss of power, misfires, and, in severe cases, mechanical damage to the injector or engine. By making these false representations and failing to disclose the existence of the Defect in the Class Vehicles, and thereby exposing occupants to risk of injury and death, Defendants engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that Hyundai might seek to apply.

139.    Pursuant to the TREAD Act, 49 U.S.C. § 30118, automobile manufacturers are required to report information regarding customer complaints and warranty claims to NHTSA, and federal law imposes criminal penalties against manufacturers who fail to disclose known safety defects. Hyundai owed a continuing duty to Plaintiff and Class Members to disclose any risks to life and limb that its products pose.  It continually breached that duty.

140.    Hyundai breached its duties to consumers by knowingly selling Class Vehicles with the defective Engines on an ongoing basis.

43

141.    Hyundai's knowledge of the Defect is evidenced by numerous NHTSA complaints by consumers, many of whom reported contacting Hyundai directly about the defective fuel injectors. Other NHTSA complainants reported taking their vehicles to Hyundai's dealers, who are agents of Hyundai and, on information and belief, report consumer complaints back to Hyundai.

142.    Thus, Hyundai had continuing knowledge of the Defect and the dangers it posed, yet it continued to market and sell their products. Plaintiff's and other Class Members' claims are not time barred.

### B.    Fraudulent Concealment Tolling

143.    Hyundai had a duty to disclose to Plaintiff and the Class Members the true quality and nature of the Class Vehicles, that the Class Vehicles had a uniform defect; and that the Defect requires repairs, poses a safety risk, and reduces the intrinsic and resale value of the affected vehicles.

144.    This duty arose, *inter alia*, under the TREAD Act, 49 U.S.C. § 30118.

145.    Hyundai knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Defect, as alleged herein. Hyundai concealed and omitted the Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

146.    Defendants knew, or were reckless or negligent in not knowing, that the Class Vehicles contain the Defect, as alleged herein.

44

147.    Defendants concealed and omitted to disclose the Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

148.    Despite their knowledge of the Defect, Defendants failed to disclose and concealed this material information from Plaintiff and other Class Members and instead continued to market the Class Vehicles as safe and durable.

149.    The purpose of Defendants' concealment of the defective fuel injectors was to prevent Plaintiff and other Class Members from seeking redress.

150.    Plaintiff and the other Class Members justifiably relied on Defendants to disclose the existence of dangerous defects, including the Defect, in the Class Vehicles that they purchased or leased, because the Defect was not discoverable by Plaintiff and the other Class Members through reasonable efforts.

151.    Any applicable statute of limitations has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior was ongoing.

## C.    Discovery Rule Tolling

152.    Through the exercise of reasonable diligence, Plaintiff and other Class Members could not have discovered prior to the filing of this lawsuit that Defendants were concealing and misrepresenting the existence of the Defect, which is installed in the Class Vehicles, and the risks it posed.

45

153.   Plaintiff and the other Class Members could not have reasonably discovered and could not have known of facts that would have caused a reasonable person to suspect, that Defendants failed to disclose material information within their knowledge about a dangerous defect to consumers worldwide.

## CLASS ACTION ALLEGATIONS

154.   Plaintiff brings this class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

155.   Plaintiff seeks to represent a Class ("Nationwide Class") defined as:

> All current and former owners or lessees of a Class Vehicle purchased or leased in the fifty States, the District of Columbia, Puerto Rico, and all other United States territories and/or possessions.

156.   Plaintiff seeks to represent a Georgia statewide Class (the "Georgia Class") defined as follows:

> All current and former owners and lessees of a Class Vehicle purchased or leased in the State of Georgia.

157.   Excluded from the Statewide Class and Nationwide Class (together, "Classes") are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.  Plaintiff reserves the right to modify or amend definitions of the Classes, and to add additional Classes and sub-classes, as appropriate, during the course of this litigation.

46

158.   This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

159.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**   The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While Plaintiff is informed and believes that there are not less than at least approximately 200,000 members of the Classes, the precise number of Class Vehicles is unknown to Plaintiff but may be ascertained from Hyundai's books and records. Nationwide and Statewide Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

160.   **Commonality and Predominance – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).**   This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

    a.  whether Defendants engaged in the conduct alleged herein;

    b.  whether Defendants' alleged conduct violates applicable law;

47

c. whether Defendants designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

d. whether Defendants made false or misleading statements about the quality, safety and characteristics of the Class Vehicles and/or the fuel injectors;

e. whether the Class Vehicles contain the Defect;

f. whether Defendants had actual or implied knowledge about the Defect;

g. whether Defendants failed to disclose the Defect to Plaintiff and the other members of the Classes;

h. whether Defendants' omissions and concealment regarding the quality, safety and characteristics of the Class Vehicles and/or the fuel injectors were likely to deceive members of the Statewide Classes in violation of the state consumer protection statutes alleged herein;

i. whether Hyundai breached its express warranties with respect to the Class Vehicles;

j. whether Hyundai breached its implied warranties with respect to the Class Vehicles;

48

k. whether the members of the Classes overpaid for their Class Vehicles as a result of the Defect alleged herein;

l. whether the members of the Classes are entitled to damages, restitution, disgorgement, statutory damages, exemplary damages, equitable relief, and/or other relief; and

m. the amount and nature of relief to be awarded to Plaintiff and the other members of the Classes.

161. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Classes because Plaintiff and the members of the Classes purchased or leased Class Vehicles that contain defective fuel injectors, as described herein. Neither Plaintiff nor the other members of the Classes would have purchased the Class Vehicles or would not have paid as much as they did for the Class Vehicles, had they known of the Defect. Plaintiff and the other members of the Classes suffered damages as a direct proximate result of the same wrongful practices in which Defendants engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other members of the Classes.

162. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Classes that they seek to

49

represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, including automotive litigation, and Plaintiff intends to prosecute this action vigorously. The interests of the members of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

163. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Nationwide and Statewide Class Members as a whole.

164. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the others members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the other members of the Classes to individually seek redress for Defendants' wrongful conduct. Even if these Class Members could afford individual litigation, the court system could not. Individual litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast,

the class action device, as intended by Congress, presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### COUNT 1
### Violation of the Magnuson-Moss Warranty Act
### (15 U.S.C. § 2301)
### (Individually and on behalf of the Classes)

165.    Plaintiff incorporates the allegations from paragraphs 1-164 as if fully set forth herein.

166.    Plaintiff makes this claim individually and on behalf of the Classes.

167.    The Court has jurisdiction under 28 U.S.C. § 1332(a)–(d).

168.    The Class Vehicles sold as new are "consumer products" under the Magnuson-Moss Warranty Act.

169.    Plaintiff and the Classes are "consumers" within the meaning of the Act. They are consumers because they are people entitled by applicable state law to enforce implied warranties against Hyundai. Hyundai is a "supplier" and "warrantor" under the Act.

170.    The Act provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

171.    Hyundai provided Plaintiff and the Classes with an implied warranty of merchantability for the Class Vehicles, an "implied warranty" under the Act. As part

51

of that implied warranty, Hyundai guaranteed that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

172.   Hyundai breached its implied warranties and is thus liable to Plaintiff and the Classes under the Act. The Class Vehicles share a common defect in that they are equipped with the same defective fuel injectors, which can suddenly fail during normal operation, leaving occupants of the vehicles vulnerable to crashes, serious injury, and death at highway speeds.

173.   In its capacity as a warrantor, Hyundai had knowledge of the Defect inherent in the Class Vehicles.

174.   Any effort by Hyundai to limit the implied warranties that would exclude coverage for Class Vehicles is procedurally and substantively unconscionable.

175.   Plaintiff and the Classes have had sufficient direct dealings with Hyundai, its agents, or both to establish privity of contract. Even so, privity is not needed here because Plaintiff and the Classes are intended third-party beneficiaries of contracts between Hyundai and its dealers. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were, after

all, designed for and intended to benefit consumers. In any event, privity is not needed because the Class Vehicles are dangerous instrumentalities.

176. Under the Act, Plaintiff and the Classes are entitled to bring this class action and are not required to give Hyundai notice or opportunity to cure until the Court determines the representative capacity of Plaintiff under Rule 23.

177. Plaintiff and the Classes would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments they have made. Plaintiff and the Classes have not re-accepted their Class Vehicles by retaining them.

178. The amount in controversy for Plaintiff and the Class Members' individual claims meets or exceeds $25. The amount in controversy of this action exceeds $50,000 (exclusive of interest and costs), computed on the basis of all claims to be determined in this lawsuit. Plaintiff, individually and on behalf of all other Class Members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. The Act also entitles Plaintiff and the Classes to recover their aggregate costs and expenses (including attorneys' fees) that are reasonably incurred in the commencement and prosecution of this civil action.

**COUNT 2**
**Violations of Georgia's Uniform Deceptive Trade Practices Act**
**(O.C.G.A. § 10-1-372)**
**(Individually and on behalf of the Classes)**

179.    Plaintiff incorporates the allegations from paragraphs 1-178 as if fully set forth herein.

180.    Plaintiff makes this claim individually and on behalf of the Classes.

181.    Plaintiff claims under Georgia's Uniform Deceptive Trade Practices Act are "in addition to" and thus not duplicative of their warranty claims.

182.    Hyundai has engaged in deceptive trade practices under O.C.G.A. § 10-1-372(a)(5) by representing that the Class Vehicles have "characteristics," "uses," or "benefits" when the Class Vehicles lack those characteristics, uses, or benefits. It has engaged in deceptive trade practices under § 10-1-372(a)(6) by representing that the Class Vehicles are of a "particular standard, quality, or grade" when the Class Vehicles are not of that standard, quality or grade. It has engaged in deceptive trade practices under § 10-1-372(a)(9) by advertising the Class Vehicles with intent not to sell them as advertised. And it has engaged in deceptive trade practices under § 10-1-372(a)(12) by engaging in "other conduct which similarly creates a likelihood of confusion or misunderstanding."

183.    Plaintiff relied on Hyundai's deceptive omissions.

184.    Plaintiff is likely to be damaged by Hyundai's deceptive trade practices. For example, Hyundai claims that Plaintiff's only recourse is to have its authorized

54

dealers or service centers repair the engines, but the "repaired" fuel injectors are defective too. Thus, Plaintiff will continue to suffer harm.

185.   Plaintiff will also suffer future harm because Hyundai's deceptive trade practices will, in effect, leave them saddled with another defective Class Vehicle. That's in part because the resale market for motor vehicles with dangerously defective motors is nonexistent. Vehicles without functioning motors are hardly motor vehicles at all. So, Plaintiff's only option is to trade the Class Vehicles with Hyundai. But the only vehicles that Hyundai makes in the same price range are Class Vehicles. Because of Hyundai's deceptive trade practices, Plaintiff is likely stuck with Hyundai's defective products for the foreseeable future. Under § 10-1-373(b)(2), Plaintiff may recover costs and attorney's fees because Hyundai willfully engaged in those trade practices knowing that they are deceptive.

## COUNT 3
### Breach of Express Warranty
### (O.C.G.A. § 11-2-313)
### (Individually and on behalf of the Classes)

186.   Plaintiff incorporates the allegations from paragraphs 1-185 as if fully set forth herein.

187.   Plaintiff makes this claim individually and on behalf of the Classes.

188.   Hyundai is a "seller" under O.C.G.A. § 11-2-313 with respect to the Class Vehicles. Plaintiff and the Classes are "buyers" under those statutes.

189.   Plaintiff and the Classes have had sufficient direct dealings with Hyundai, its agents, or both to establish privity of contract. Hyundai has a direct relationship with its dealers, and they worked together to promote and sell the Class Vehicles. Even so, privity is not needed here because Plaintiff and the Classes are intended third-party beneficiaries of contracts between Hyundai and its dealers. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were, after all, designed for and intended to benefit consumers. In any event, privity is not needed because the Class Vehicles are dangerous instrumentalities.

190.   Section 11-2-313 provides that a seller's affirmations of fact or promises about the goods that become part of the basis of the bargain creates express warranties that the goods will conform to the affirmations or promises. Descriptions of goods that become part of the bargain also create express warranties that the goods will conform to those descriptions. And samples or models of goods that become part of the bargain create express warranties that the goods will conform to the samples or models.

191.   The powertrain warranty that Hyundai provides for Class Vehicles is an express warranty. The warranty guarantees, among other things, that Hyundai will repair "any defect" in the Class Vehicles. Hyundai created and extended the

warranty to Plaintiff and the Classes in connection with the sale of Class Vehicles. The warranty formed part of the basis of the bargain for Hyundai's sale of Class Vehicles to Plaintiff and the Classes.

192.   Hyundai described the Class Vehicles as reliable and safe. Those affirmations of fact, promises, and descriptions were part of the basis of the bargain. The Class Vehicles were bought and sold subject to those warranties.

193.   Those warranties are not "merely" "affirmation[s] … of the value of the goods" under  § 11-2-313(2). Nor are they "merely the seller's opinion or commendation of the goods" under § 11-2-313(2).

194.   If a court construes any of the express warranties as limited to vehicle defects related to materials or workmanship, Hyundai breached that express warranty too.

195.   Hyundai breached its express warranties by, among other things, selling Plaintiff and the Class Vehicles with defective engines. Hyundai knew the Class Vehicles were defective before it sold them. Hyundai knew that Plaintiff and the Classes could not discover the Defect by inspecting the vehicles. Hyundai had a duty to disclose the Defect but failed to do so.

196.   The Class Vehicles were defective at the time of sale, contracting, or both. Plaintiff and the Classes used the Class Vehicles in a manner consistent with the vehicles' operating instructions.

197.   Plaintiff and the Classes experienced engine problems covered by Hyundai express warranties within the warranty period and sought repairs within the warranty period at Hyundai dealerships or service centers.

198.   Hyundai has been unwilling or unable to properly repair the Class Vehicles. Even though Hyundai may have tried to repair some of the Class Vehicles, the repairs failed to fix the Defect. Some consumers sought repairs multiple times during the warranty period and still experienced the Defect. The repairs were ineffective.

199.   Hyundai's express warranties do not require that Plaintiff or the Classes give it direct written notice of the Defect. Even if the express warranties were to require direct written notice of the Defect, Hyundai has waived that requirement by conduct because it attempted but failed to properly repair the Defect under the warranty. In any event, Plaintiff and the Classes have given Hyundai written notice of the Defect.

200.   Plaintiff and the Classes notified Hyundai of the Defect within a reasonable time after they discovered it.

201.   Hyundai had actual notice of the Defect in the Class Vehicles before sale and received timely notice of the breaches experienced by Plaintiff and the Class Members.

202.    Hyundai breached its express warranties because the Class Vehicles are neither safe nor reliable: they are prone to sudden and catastrophic fuel injector failure and for that reason they are unsafe and unreliable.

203.    Hyundai's failure to provide Plaintiff and Class Members with a non-defective replacement vehicle or a refund of the purchase price departs from commercially reasonable behavior and violates Plaintiff and the Class Members' objectively reasonable expectations arising from the express warranties.

204.    The express warranties fail in their essential purpose. The contractual remedy is insufficient to make Plaintiff and the Classes whole because Hyundai failed or refused to adequately provide the promised remedies in a reasonable time.

205.    Plaintiff and the Class Members' recovery is not limited to the express warranty of repair for defective materials and workmanship. Plaintiff and the Classes seek all the relief that law allows.

206.    Repairs and replacement injectors cannot cure the damage that the Class Vehicles have caused. Plaintiff and the Classes have already suffered significant incidental and consequential damages, including diminution in value and loss of use—because of Hyundai's breaches of its express warranties and because of its failure to properly remedy the problem in a reasonable time. Limiting Plaintiff and the Class Members' remedies to repair, replacement, or both would only guarantee that they would never be made whole.

207.   Any attempt by Hyundai to disclaim or limit its express warranties by way of consumers would be inappropriate under the circumstances. Any asserted limitation is procedurally and substantively unconscionable and thus unenforceable because Hyundai knowingly sold a defective product without informing consumers and failed to honor its express warranties.

208.   As a direct and proximate result of Hyundai's breach of express warranties, Plaintiff and the Classes sustained damages.

## COUNT 4
### Breach of Implied Warranty of Merchantability
### (O.C.G.A. § 11-2-314)
### (Individually and on behalf of the Classes)

209.    Plaintiff incorporates the allegations from paragraphs 1-208 as if fully set forth herein.

210.   Plaintiff makes this claim individually and on behalf of the Classes.

211.   Hyundai is a "seller" and "merchant" under O.C.G.A. § 11-2-314 with respect to the Class Vehicles.

212.   Section 11-2-314 creates a warranty of merchantability implicit in the contracts for the sales of Class Vehicles. The Class Vehicles were bought and sold subject to that warranty.

213.   Hyundai breached its implied warranty of merchantability. At the time of sale and all relevant times, the Class Vehicles could not pass without objection in

60

the trade under the contract description, are not fit for their ordinary purpose, and do not conform to the promises or affirmations of fact made in marketing materials.

214.    Automobiles' ordinary purpose is providing safe, reliable transportation. The Defect in the Class Vehicles makes them unsafe and unreliable as means of transportation. The Defect affects the Class Vehicles' drivability and usefulness. Plaintiff and the Class Members' vehicles are or were not drivable because of the Defect.

215.    Automobiles prone to sudden and catastrophic fuel system failure are not merchantable. Based upon the Defect, Hyundai has failed to meet the expectations of a reasonable consumer.

216.    Hyundai breached the implied warranty of merchantability in connection with its sale and distribution of the Class Vehicles. The Defect existed when the Class Vehicles left Hyundai's possession and is substantially certain to manifest.

217.    Hyundai has waived any implied warranty notice requirement by conduct because it attempted but failed to properly repair the Defect under the warranty.

218.    Hyundai had actual notice of the Defect in the Class Vehicles before sale and received reasonable notice of the breaches experienced by Plaintiff and the Class Members.

219.  Plaintiff and the Classes have had sufficient direct dealings with Hyundai, its agents, or both to establish privity of contract. Hyundai has a direct relationship with its dealers, and they worked together to promote and sell the Class Vehicles. Even so, privity is not needed here because Plaintiff and the Classes are intended third-party beneficiaries of contracts between Hyundai and its dealers. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were, after all, designed for and intended to benefit consumers. In any event, privity is not needed because the Class Vehicles are dangerous instrumentalities.

220.  If Plaintiff and the Class Members had known about the Defect in the Class Vehicles, they would not have bought them or would have paid significantly less for them.

221.  Plaintiff and the Class Members gave Hyundai a chance to cure its breach of warranty and otherwise complied with any obligations under the implied warranty of merchantability. That said, and despite knowing of the Defect before or concurrently with the release of the Class Vehicles, Hyundai has refused to provide Plaintiff and the Classes with appropriate warranty relief, leaving them without the functional product they thought they were buying.

222.   Providing additional notice to Hyundai now is futile because Hyundai has continually failed to provide adequate remedies to Plaintiff and Class Members.

223.   If Hyundai attempted to exclude or modify the implied warranty of merchantability in writing, the attempted exclusion or modification is ineffective because it is inconspicuous. What's more, the circumstances cause any exclusion or limitation of remedies to fail their essential purpose. Any limitation or exclusion of consequential damages is substantively and procedurally unconscionable.

224.   As a direct and proximate result of Hyundai's breach of the implied warranty of merchantability, Plaintiff and the Classes sustained damages.

## COUNT 5
### Fraudulent Concealment
### (Individually and on behalf of the Classes)

225.    Plaintiff incorporates the allegations from paragraphs 1-224 as if fully set forth herein.

226.   Plaintiff makes this claim individually and on behalf of the Classes.

227.   Hyundai was aware of the Defect when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Classes.

228.   Having been aware of the Defect and having known that Plaintiff and the other members of the Classes could not have reasonably been expected to know of the Defect, Hyundai had a duty to disclose the Defect to Plaintiff and the other members of the Classes in connection with the sale or lease of the Class Vehicles.

63

229.  Hyundai did not disclose the Defect to Plaintiff and the other members of the Classes in connection with the sale of the Class Vehicles.

230.  For the reasons set forth above, the Defect comprises material information with respect to the sale or lease of the Class Vehicles.

231.  In purchasing the Class Vehicles, Plaintiff and the other members of the Classes reasonably relied on Hyundai to disclose known material defects with respect to the Class Vehicles.

232.  Had Plaintiff and the other members of the Classes known of the Defect, they would have not purchased the Classes Vehicles or would have paid less for the Class Vehicles.

233.  Through its omissions regarding the Defect, Hyundai intended to induce, and did induce, Plaintiff and the other members of the Classes to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

234.  As a direct and proximate result of Hyundai's omissions, Plaintiff and the other members of the Classes either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests relief against Defendants as set forth below:

1.      Certifying the proposed Nationwide and Statewide Classes;

2.      Appointing Plaintiff as the Classes representatives and Interim Class Counsel as Class Counsel;

3.      Ordering Defendants to pay actual and statutory damages (including punitive damages) and restitution to Plaintiff and the other Class Members, as allowable by law;

4.      Enjoining Defendants from continuing the unfair business practices alleged in this Complaint;

5.      Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

6.      Ordering Defendants to pay attorneys' fees and costs of suit;

7.      Awarding injunctive relief requiring Hyundai to promptly and fully inform Class Members of the Defect and its associated dangers and instructing such Class Members to cease driving their vehicles, and ordering Hyundai to provide free loaner vehicles of comparable make, model, or value to the Class Vehicle each Class Member owns or leases until an adequate remedy for the Defect is installed in the Class Vehicles; and

65

8.    Granting such additional relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial on all issues so triable.


Dated:  August 21, 2025          */s/ H. Clay Barnett, III*
                                 H. Clay Barnett, III
                                 W. Daniel "Dee" Miles, III
                                 J. Mitch Williams
                                 Dylan T. Martin
                                 Trenton H. Mann
                                 **BEASLEY, ALLEN, CROW,**
                                 **METHVIN, PORTIS & MILES, P.C.**
                                 272 Commerce Street
                                 Montgomery, Alabama 36104
                                 Telephone: 334-269-2343
                                 Dee.Miles@Beasleyallen.com
                                 Clay.Barnett@BeasleyAllen.com
                                 Mitch.Williams@BeasleyAllen.com
                                 Dylan.Martin@BeasleyAllen.com
                                 Trent.Mann@BeasleyAllen.com