IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALEXANDRA LOPEZ,<br><br>Plaintiff,<br><br>v.<br><br>HYUNDAI MOTOR AMERICA, INC., et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 2:25-cv-00661-BL |

**ORDER**

This case is before the court on the Defendants' second motion to compel arbitration and stay the proceedings. (Doc. 33).[1] For the reasons set forth below, the motion is due to be granted.

This class action is based on a fuel injector defect allegedly present in several Hyundai models. (*See* doc. 1). The Defendants move to compel arbitration based

[1] The court denied the Defendants' first motion to compel arbitration as moot when it ordered the Plaintiff to file an amended complaint to address standing. (*See* doc. 31). Upon review of the Amended Complaint (doc. 32), the court finds that the Plaintiff alleges an adequate threshold factual basis for her standing. She sufficiently articulates her individual standing in connection with her claims regarding various Hyundai models because she alleges that each model has substantially identical or identical defects. Whether the Plaintiff may bring claims related to models she did not purchase will be resolved by the court's decision on class certification. Therefore, the Amended Complaint is sufficient. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (holding that it is appropriate to defer standing issues until after class certification where certification issues are "'logically antecedent' to Article III concerns."); *E.g.*, *Hadjian v. Mercedes-Benz, USA, LLC*, No. 1:21-CV-00469-SCJ, 2022 WL 3699603, at *5 (N.D. Ga. Mar. 31, 2022).

on the Connected Service Agreement the Plaintiff executed when she purchased her Hyundai vehicle.

## I. Procedural History and Background

The complaint alleges that, on July 3, 2021, Plaintiff Lopez purchased a 2022 Hyundai Tucson in Roswell, Georgia. (Doc. 32 at 10). According to the Defendants' motion to compel, "[a]fter Plaintiff allegedly bought her Vehicle in July of 2021 . . . she enrolled in the optional system 'Hyundai Bluelink services,' in which she executed the [Connected Services Agreement]." (Doc. 33 at 7). Lopez assented to the Connected Services Agreement ("the CSA") twice: First through the Dealer-Assisted Enrollment process on the Dealer Web Portal when she enrolled her 2022 Hyundai Tucson in Bluelink services on July 3, 2021, and a second time via the online Customer Web Portal on August 14, 2021. (Doc. 33-1 at 6).

Bluelink is

> an optional telematics technology with various functions, features, and services, such as Connected Care, a comprehensive safety and car care system. Bluelink's functions, features, and services include, but are not limited to, on demand diagnostics and alerts, service link, enhanced roadside assistance, automatic emergency assistance, remote start, remote door lock and unlock, and remote car finder.

(Doc. 33-1 at 2). "To enroll in Bluelink services, customers must first agree to the [CSA] in effect at the relevant time." (Doc. 33-1 at 3).

> Customers are given ample opportunity to review the CSA . . . . Some customers choose to not accept the [CSA] after their review and instead decline acceptance. In those instances, those customers are not able to

> continue with the enrollment process, cannot enroll in Bluelink services, and cannot activate Bluelink services.

(Doc. 33-1 at 4).

The CSA to which Lopez agreed contained the following provisions:

> **A. Governing Law.** To the fullest extent permitted by law and except as explicitly provided otherwise, this Agreement and any disputes arising out of or relating to it will be governed by the laws of the state of California without regard to its conflict of law principles.
>
> . . .
>
> **C. Binding Arbitration** . . . . ANY ARBITRATION UNDER THIS AGREEMENT WILL TAKE PLACE ON AN INDIVIDUAL BASIS TO THE MAXIMUM EXTENT PERMITTED BY LAW; CLASS ARBITRATIONS, CLASS ACTIONS OR REPRESENTATIVE ARBITRATIONS ARE NOT PERMITTED. . . . Hyundai and you agree to arbitrate any and all disputes and claims between us arising out of or relating to this Agreement, Connected Services, Connected Services Systems, Service Plans, your Vehicle, use of the sites, or products, services, or programs you purchase, enroll in or seek product/service support for, whether you are a Visitor or Customer, via the sites or through mobile application, except any disputes or claims which under governing law are not subject to arbitration, to the maximum extent permitted by applicable law. This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us subject to arbitration to the fullest extent permitted by law. . . . The agreement to arbitrate otherwise includes, but is not limited to:
>
> > claims based in contract, tort, warranty, statute, fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; claims relating to your vehicle for which you seek product or service support via the sites; claims arising out of or

> relating to the Telephone Consumer Protection Act; claims relating to your data privacy or information security; and claims that may arise after the termination of this Agreement.

> . . . You agree that, by entering into this Agreement, you and Hyundai are each waiving the right to a trial by jury or to participate in a class or representative action to the maximum extent permitted by law. This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision. . . .

> . . . The arbitration will be governed by the Consumer Arbitration Rules (the "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and will be administered by the AAA.

(Doc. 33-5 at 11).

The CSA also contains a delegation provision stating as follows:

> All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement['s] other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable. However if putative class or representative claims are initially brought by either party in a court of law, and a motion to compel arbitration is brought by any party, then the court shall decide whether this agreement permits class proceedings. For the avoidance of doubt, the court and arbitrator shall be bound by the terms of this Agreement, including with regard to the class and representative waiver provision.

(Doc. 33-5 at 11). The severability provision states: "If any part of this Agreement is considered invalid by a court or arbitrator, the rest of it will remain enforceable." (Doc. 33-5 at 12).

According to Lopez's complaint,

> 37. While operating on public roads on May 30, 2025, Plaintiff's Engine shook from misfire, lost motive power, and entered a computer directed reduced power mode. The next day, Plaintiff presented her Class Vehicle to Rick Case Hyundai for repair, which diagnosed a failed fuel injector at approximately 36,682 miles. Plaintiff Lopez's Class Vehicle was not repaired until a later date due to part shortages. At the direction of Hyundai, Rich Case Hyundai replaced all four fuel injectors following TSB 25-FL-001H.
>
> 38. Hyundai's TSB 25-FL-001H repair was not successful as Plaintiff's Class Vehicle continues to exhibit similar symptoms.

(Doc. 32 at 11–12). On August 21, 2025, Lopez filed this class action asserting that the fuel injector installed in the 2022 Hyundai Tucson was defective, as are all fuel injectors the Defendants installed in model year 2022 to 2023 Hyundai Tucson and Santa Cruz, model year 2021 to 2023 Santa Fe, and model year 2020 to 2023 Hyundai Sonata vehicles equipped with the Smartstream Theta III 2.5L MPI + GDI Engine. (Doc. 32 at 4, 12).

The operative complaint asserts five counts: (1) a violation of the Magnuson-Moss Warranty Act (15 U.S.C. § 2301), (2) a violation of Georgia's Uniform Deceptive Trade Practices Act (O.C.G.A. § 10-1-372), (3) a breach of express warranty (O.C.G.A. § 11-2-313), (4) a breach of implied warranty of merchantability (O.C.G.A. § 11-2-314), and (5) fraudulent concealment. (Doc. 32). Lopez seeks to represent a class of "at least approximately 200,000" Hyundai vehicle owners. (Doc. 32 at 49).

The Defendants now seek to compel Lopez to pursue her claims in arbitration on an individual basis rather than a class-wide basis, and to stay this case pending arbitration. (Doc. 33). Lopez argues the following: (1) her Magnuson-Moss Warranty Act ("MMWA") and included state law express warranty claim cannot be compelled into arbitration under the one document rule, (2) she did not assent to the terms of the CSA, and (3) the scope of BlueLink's arbitration and delegation clauses do not cover her claims. (Doc. 35).

## II. Legal Standard

Section 2 of the Federal Arbitration Act (the "FAA") provides as follows:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]

9 U.S.C. § 2. Consequently, "Section 2 requires a two-pronged inquiry: first, whether there is an arbitration agreement in writing; and second, if so, whether the agreement is part of a transaction involving interstate commerce." *Chambers v. Groome Transp. of Alabama*, 41 F. Supp. 3d 1327, 1338 (M.D. Ala. 2014); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-28 (1985); *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004). The party seeking to compel arbitration bears the initial burden of proving both prongs.

*Chambers*, 41 F. Supp. 3d at 1338. "Once the moving party meets that initial burden, the party opposing arbitration has the burden of establishing that the agreement is invalid, or that it does not apply to the dispute in question." *Wisener v. CMH Homes, Inc.*, No. 1:21-cv-1075, 2022 WL 17839010, *3 (N.D. Ala. Dec. 21, 2022) (citing *SSC Selma Operating Co., LLC v. Fikes*, 238 So. 3d 635, 636-37 (Ala. 2017)); *see also Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91–92 (2000). This inquiry is not approached with a "thumb on the scale in favor of arbitration because the federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Bd. of Trs. of City of Delray Beach & Firefighters,* 622 F.3d 1335, 1342 (11th Cir. 2010) (citation and internal quotation marks omitted); *see also Volt Info. Sciences, Inc. v. Bd. of Trs.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) ("[T]he FAA does not require parties to arbitrate when they have not agreed to do so.").

"The threshold question of whether an arbitration agreement exists at all is 'simply a matter of contract.'" *Bazemore v. Jefferson Capital Sys., LLC*, 827 F. 3d 1325, 1329 (11th Cir. 2016). The Court of Appeals for the Eleventh Circuit has held that "state law generally governs whether an enforceable contract or agreement to arbitrate exists." *Id.* (quoting *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005)). The standard for determining the existence of an arbitration agreement is the same as that applied to a motion for summary judgment. *Id.* at 1339

("[A] District Court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement."). An order compelling arbitration is "'in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate.'" *In re Checking Acct. Overdraft Litig.*, 754 F.3d 1290, 1294 (11th Cir. 2014) (citation omitted). Evidence of formation is to be viewed in a light most favorable to the non-moving party. *See Hearn v. Comcast Cable Commc'ns, LLC*, 992 F.3d 1209, 1215 n.3 (11th Cir. 2021).

The Eleventh Circuit has stated that a "threshold question in any motion to compel arbitration . . . is which issues should be decided by the trial court and which issues should be decided by an arbitrator." *Reiterman v. Abid*, 26 F.4th 1226, 1231 (11th Cir. 2022).

> To answer that question, courts have identified three distinct types of challenges to motions to compel arbitration: "(1) a challenge to the validity of the arbitration clause standing alone, (2) a challenge to the validity of the contract as a whole, and (3) a challenge to the very existence of the contract." *Wiand v. Schneiderman*, 778 F.3d 917, 924 (11th Cir. 2015) (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444–45 n.1, 126 S. Ct. 1204, 1208 n.1, 163 L.Ed.2d 1038 (2006)). Courts must decide any challenges to the existence of the contract or to the validity of the arbitration clause standing alone before compelling arbitration. *Id.* However, an arbitrator must decide any challenges to the validity of the contract as a whole should the trial court find that a contract containing a valid arbitration clause exists and that some or all of the claims in the lawsuit are contemplated by the arbitration clause. *Id.*

*Reiterman*, 26 F.4th at 1231.

The Eleventh Circuit has further stated that

> before ruling on a motion to compel arbitration, the court must first determine whether the arbitration agreement contains a delegation provision.
>
> If the arbitration agreement does contain a delegation provision, the court must then determine: (a) whether the parties have manifested a clear and unmistakable intent to arbitrate the relevant gateway issue; (b) whether the claimant has challenged the delegation provision specifically; and, if so, (c) whether the delegation provision is enforceable under the FAA.

*Dunn v. Glob. Tr. Mgmt., LLC*, No. 21-10120, 2024 WL 4379966, at *6 (11th Cir. Oct. 3, 2024). A delegation provision is an additional, antecedent agreement, severable from the remainder of the arbitration agreement, to arbitrate the gateway question of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010); *In re Checking Acct. Overdraft Litig. MDL No. 2036*, 674 F.3d 1252, 1255 (11th Cir. 2012).

"Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 944 (1995) (internal quotation marks omitted); *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1147 (11th Cir. 2015). This is a "heightened standard." *Rent-A-Ctr., W., Inc.*, 561 U.S. at 69 n.1.

> To determine "whether the parties have manifested a clear and unmistakable intent to arbitrate gateway issues, . . . we look to the wording of the delegation provision itself." [*Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1267 (11th Cir. 2017)]. "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).
>
> An agreement may contain a choice-of-law provision that specifies which law applies to issues of contract formation. If so, a court may need to determine whether that choice-of-law provision applies and whether it is valid.

*Dunn*, No. 21-10120, 2024 WL 4379966, at *6.

Because arbitration agreements are governed by contract law, when "enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must 'give effect to the contractual rights and expectations of the parties.'" *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (quoting *Volt v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). In interpreting a contract, courts look to (a) the ordinary and popular meaning of the terms; (b) give effect to surrounding provisions to avoid superfluity; (c) read the contract as a whole; and (d) avoid an absurd or inequitable result. *See Schertzer v. Bank of America*, 109 F.4th 1200, 1208 (9th Cir. 2024) (citations omitted). "In cases of uncertainty . . . . the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." *Int'l*

*Bhd. of Teamsters, Local 396 v. NASA Servs.*, 957 F.3d 1038, 1046 (9th Cir. 2020) (quoting Cal. Civ. Code § 1654).

## III. Formation

Before addressing the arbitration provision, the court must first address Lopez's challenge to the existence of the agreement as a whole. *See Reiterman*, 26 F.4th at 1231 ("Courts must decide any challenges to the existence of the contract or to the validity of the arbitration clause standing alone before compelling arbitration."). Lopez argues that she never assented to the terms of the CSA because "she was not involved in enrolling in the Bluelink services, the dealer set it up on her behalf," and because "she was not informed about, nor did she review, the terms and conditions related to BlueLink, including the arbitration and delegation provisions." (Doc. 35 at 10). Lopez argues that the Defendants fail to show a genuine dispute of material fact as to whether the contract was formed because they rely on a declaration containing only "generalized averments" as to what a customer "would see" and must do to sign up for Bluelink Services; they have no evidence showing what Lopez in particular did and what she personally agreed to. (Doc. 35 at 10).

The Defendants' evidence consists of a declaration and supporting documents. The declaration, executed by Vijay Rao, the Director of Connected Ops

& Owner Apps/Web for Hyundai, and the former Senior Group Manager of Digital Business & Connected Ops, states, in part, as follows:

> BLUELINK ENROLLMENT & CSA ACCEPTANCE
>
> 7. To enroll in Bluelink services, customers must first agree to the Connected Services Agreement ("CSA") in effect at the relevant time. The CSA is often referred to as the "Terms and Conditions" or "Terms & Conditions." Hyundai makes a copy of the CSA available to every customer who enrolls in the Bluelink services plan. The CSA is associated with a particular "TNCID" in HAEA's internal records, which can then be used to identify the version of the CSA to which the customer has agreed. The TNCID does not necessarily correlate with the year of the effective date of the CSA.
>
> 8. Customers can enroll in Bluelink services in several ways. One common way to enroll in Bluelink services is on the Dealer Web Portal ("DWP") through a process known as the Dealer-Assisted Enrollment ("DAE") process.
>
> Dealer Web Portal & Dealer-Assisted Enrollment
>
> 9. In the DAE process, an employee of a dealership and a customer both use the online DWP on a dealer-owned device, such as a tablet, to enroll the customer in Bluelink services. The dealer employee creates or confirms an account for the customer on the dealer-owned device, and it then associates the customer's purchased vehicle with that account. The dealer employee hands over control of the dealer-owned device to the customer to enter or verify his or her personal information, including a personal email address, and to review and agree to the CSA in effect at that time.
>
> 10. All dealer employees receive training and specific instructions regarding the DAE process. Dealer employees must follow these same specific steps, in order, each time they interact with a customer who seeks to enroll in Bluelink services. As part of that required training, dealer employees are instructed as to when control of the dealer-owned device should be given over to a customer, and what dealer employees may, or may not, fill out on a customer's behalf. Dealer employees are

also prompted with instructions on the dealer-owned device during the enrollment process reminding them to hand over control to the customer at the appropriate juncture so the customer can input his or her personal information and review and agree to the CSA.

11. The customer, upon receiving the dealer-owned device, must enter and/or verify his or her own personal information. He or she is presented with a checkbox indicating his or her acceptance of the CSA "Terms & Conditions." The phrase "Terms & Conditions" is underlined and includes a hyperlink to the CSA in blue font. To enroll in Bluelink services, the customer must check the box to acknowledge that he or she agrees to the CSA "Terms & Conditions," and then select the "Complete" button just below. The checkbox is not prepopulated with a check mark. On the contrary, the customer must check that box himself or herself to acknowledge his or her acceptance of the CSA "Terms & Conditions." Similarly, the "Complete" button is not automatically selected. Rather, the customer must select the "Complete" button to proceed with enrollment.

12. Customers are given ample opportunity to review the CSA "Terms & Conditions". Some customers choose to not accept the "Terms & Conditions" after their review and instead decline acceptance. In those instances, those customers are not able to continue with the enrollment process, cannot enroll in Bluelink services, and cannot activate Bluelink services.

13. Should the customer choose to accept the CSA "Terms & Conditions" and proceed with the enrollment process—after the box is checked and the "Complete" button selected—the dealer-owned device generates instructions directing the customer to hand the device back to the dealer employee for further processing. The dealer employee receives the dealer-owned device and completes the enrollment form.

14. In order to successfully enroll in and activate Bluelink services through the DAE process, the customer must complete the steps requiring him or her to check the box acknowledging his or her acceptance of the CSA "Terms & Conditions," and selecting the "Complete" button which acknowledges that he or she wishes to proceed with and complete the enrollment.

> 15. Attached as Exhibit A is a true and correct copy of a screen capture that reflects the content and general layout that customers would see when accepting the then-effective CSA "Terms & Conditions" on the DWP through the DAE process.
>
> Customer Web Portal
>
> 16. The customer can also use the online Customer Web Portal ("CWP") through a web browser to access and utilize certain Bluelink services through MyHyundai.
>
> 17. The CWP provides access to the CSA Terms and Conditions in effect at that time, so the customer may review and agree to them.
>
> 18. As with the DAE process, customers are given an opportunity to review the CSA Terms and Conditions through the CWP.
>
> 19. Attached as Exhibit B is a true and correct copy of a screen capture that reflects the content and general layout that customers would see when accepting the then-effective CSA "Terms and Conditions" on the CWP.

(Doc. 33-1 at 3–5).

The declaration further states that, based on the "business records relating to Plaintiff's vehicle" and the "collected data therein," Lopez enrolled her vehicle in Bluelink services through the dealer-assisted enrollment process on the dealer web portal and agreed to the CSA on July 3, 2021, at 2:03 p.m. using her email address associated with her online login ID for Bluelink. (Doc. 33-1 at 6). According to the declaration, Lopez again accepted the terms of the CSA on August 14, 2021, through the customer web portal. (Doc. 33-1 at 6). The Defendants provide a screen capture

of what customers using both the dealer web portal and the customer web portal see when accepting the CSA. (*See* docs. 33-1 at 5; doc. 33-2; doc. 33-3).

Lopez's evidence consists of a declaration of her own, stating as follows:

> 6. After the vehicle purchase, the sales representative, on behalf of Defendants, provided me with a complimentary 3-year subscription to Blue Link ("Blue Link").
>
> 7. I was led to believe that Blue Link was provided to me for a period of three years, for free, and without limitation of my rights.
>
> 8. I have never paid any money or other things of value in exchange for Blue Link.
>
> 9. I have never used, or been able to use Blue Link or access its services.
>
> 10. I do not recall any involvement in the Blue Link signup process.
>
> 11. I recall that the sales representative of Rick Case Hyundai set up Blue Link on my behalf.
>
> 12. I do not recall reviewing any agreements related to Blue Link including, but not limited to, the Connected Services Agreement ("CSA") or its terms and conditions.
>
> 13. Neither Defendants nor the sales representative disclosed that, by accepting the complimentary Blue Link services, I agreed to terms and conditions containing arbitration and delegation provisions.
>
> 14. I did not know there were arbitration or delegation agreements in the terms and conditions with Defendants, nor did I know Defendants reserved the right to change the terms and conditions at any time.
>
> 15. I did not have any input or choice about the content of the terms and conditions for Defendants.
>
> 16. I would not have accepted the complimentary Blue Link service had I known all material facts related to the terms and conditions, including

> the arbitration clause, the delegation clause, and the amendments clause.

(Doc. 35-1 at 2–3).

"[S]tate law generally governs whether an enforceable contract or agreement to arbitrate exists." *Bazemore*, 827 F. 3d at 1329 (quoting *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005)). Here, the contract formation issue is governed by Georgia law because that is where the contract was allegedly formed.[2] "[A] district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement. Fed. R. Civ. P. 56(a)." *Bazemore*, 827 F.3d at 1333. "If the existence of the agreement is not genuinely disputed, the court must compel arbitration . . . . But if the opposing party

---

[2] "A federal court in a diversity case is required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits." *O'Neal v. Kennamer*, 958 F.2d 1044, 1046 (11th Cir. 1992). "Alabama applies the traditional doctrines of *lex loci contractus* to contract claims." *Colonial Life & Acc. Ins. Co. v. Hartford Fire Ins. Co.*, 358 F.3d 1306, 1308 (11th Cir. 2004) (citing *Cherry, Bekaert & Holland v. Brown*, 582 So.2d 502, 506 (Ala. 1991)). "The doctrine states that 'a contract is governed by the laws of the state where it is made except where the parties have legally contracted with reference to the laws of another jurisdiction.'" *Id.* In this case, it is undisputed that the contract, if it was formed, was formed in Georgia. There is a choice-of-law provision in the CSA stating that California law governs the agreement. (*See* doc. 33-5 at 10). However, a choice-of-law provision is not applicable until there is a determination that the contract was in fact formed. *See Bowie's Priority Care Pharmacy, L.L.C. v. CaremarkPCS, L.L.C.*, No. 6:18-CV-00300-LSC, 2018 WL 1964596, at *3 (N.D. Ala. Apr. 26, 2018). Moreover, the parties agree that Georgia law applies to the issue of contract formation in this case. (*See* doc. 33 at 15; doc. 35 at 9). "If the parties litigate the case under the assumption that a certain law applies, [the court] will assume that that law applies." *Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012); *see also Cooper v. Meridian Yachts, Ltd.*, 575 F. 3d 1151, 1171 (11th Cir. 2009) (a choice-of-law analysis is not necessary if the parties have not asserted or shown a conflict).

raises a genuine dispute of material fact as to contract formation, the court must hold a summary trial. *Lamonaco v. Experian Info. Sols., Inc.*, 141 F.4th 1343, 1347 (11th Cir. 2025). "'This court has consistently held that conclusory allegations without specific supporting facts have no probative value' for a party resisting summary judgment." *Id.* (quoting *Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000)).

> [W]hen the Court must determine whether a clickwrap or a sign-in wrap agreement formed a binding and valid arbitration agreement, the proponent of arbitration must provide evidence of the content of the terms, how the terms were displayed, and that the party providing this information had personal knowledge of these facts. *See* [*Newton v. Experian Info. Sols., Inc.*, No. 24-12398, 2025 WL 2102084, at *1–2 (11th Cir. July 28, 2025) (unpublished) (applying Georgia contract law)] (citing *Bazemore*, 827 F.3d at 1333). Then, the Court should consider whether the evidence offered proves what the plaintiff actually saw on the date of the agreement, regardless of whether the plaintiff clicked into available hyperlinks.

*Lindsey v. Experian Info. Sols., Inc.*, No. 1:25-CV-6690-TWT-JSA, 2026 WL 2204416, at *10 (N.D. Ga. May 12, 2026). The Defendants have submitted sufficient evidence on which the court can conclude as a matter of law that the parties entered into an arbitration agreement. *See Lamonaco*, 141 F.4th at 1348 ("A declaration that sets forth specific facts based on personal knowledge, describes the enrollment process, and appends the operative contract is competent evidence sufficient to satisfy [a defendant's] initial burden [to prove the existence of an arbitration agreement].").

When Lopez purchased the vehicle she assented to the terms of the CSA. Lopez admits that she became enrolled in Bluelink services when she purchased the vehicle. The only evidence before the Court indicates that she was required to click the box acknowledging her assent to the CSA—which included the Arbitration Agreement—to successfully enroll in Bluelink Services. (Doc. 33-1). The screen capture (which the Defendants say "is a true and correct copy of a screen capture that reflects the content and general layout that customers would see when accepting the then-effective CSA 'Terms and Conditions' on the CWP") shows that the CWP complies with the requirements of a valid clickwrap agreement. *See Hawkins v. CMG Media Corp.*, No. 1:22-CV-04462-JPB, 2024 WL 559591, at *2 (N.D. Ga. Feb. 12, 2024), *appeal dismissed sub nom. Bienkowski v. Cox Media Grp., LLC*, No. 24-10814-H, 2024 WL 2933342 (11th Cir. May 9, 2024) ("A '*clickwrap*' agreement is one in which an internet user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available."). Given that Lopez enrolled in Bluelink services, the box assenting to the CSA must have been clicked.

Lopez's brief is correct that the Defendants lack direct evidence of what her computer screen in particular displayed when she used the web portals. She cites *Bazemore v. Jefferson Capital System, LLC*, for the proposition that "the moving party must still establish 'what, if any, clickwrap agreement appeared on plaintiff's

computer screen[.]'" (Doc. 35 at 10) (quoting *Bazemore*, 827 F.3d at 1330). Lopez points out that "[w]hen 'attempt[ing] to satisfy this burden by [a] declaration,' a party cannot rely on vague, generalized averments. (Doc. 35 at 10) (quoting *Bazemore*, 827 F.3d at 1330–31).

After *Bazemore*, the Eleventh Circuit decided *Lamonaco v. Experian Info. Sols., Inc.* In *Lamonaco*, the court rejected the plaintiff's reliance on *Bazemore* and explicitly distinguished it, noting that "*Bazemore* turned on a failure of proof that is not present here." 141 F.4th at 1347. Specifically,

> In *Bazemore*, a cardholder sued her credit card provider, JCS, for violating the Fair Debt Collection Practices Act. 827 F.3d at 1327. JCS moved to compel arbitration under a clickwrap agreement the plaintiff had purportedly accepted when applying for the card online. *Id.* But JCS submitted no evidence of what the plaintiff saw during that process. *Id.* at 1327–28. We explained that there was
>
> > no evidence that the Internet web page or pages that [the plaintiff] viewed, or upon which she applied for her [credit card], displayed or referred to any terms or conditions of the credit card she sought, much less that she was required to consent to any such terms in order to obtain her credit card.
>
> *Id.* JCS submitted a declaration from its employee who summarily asserted that the plaintiff had accepted the terms. *Id.* He did not describe the application process, assert that the contract attached to his declaration was the same one which would have been sent to the plaintiff, or provide other supporting documentation. *Id.*
>
> JCS's declarant also claimed that a standard cardholder agreement "would have been sent" to the plaintiff via mail. *Id.* at 1328. That agreement allegedly included an arbitration clause and bound the cardholder upon first use of the card. *Id.* But JCS never proved it mailed

> the agreement to the plaintiff, nor did JCS have a copy of the specific agreement it allegedly sent. *Id.* at 1331–32. Applying Georgia law, we held that JCS's showing was "woefully inadequate." *Id.* at 1330. Indeed, the evidentiary record was so lacking that we concluded there was not even enough to justify a trial. *Id.* at 1333–34.
>
> That evidentiary record differs from the showing Experian made here. Williams attested that Lamonaco enrolled in the CreditCheck Total service on February 16, 2020, and described the online enrollment process in detail. He asserted that he had personal knowledge based on internal business records that he reviewed. He attached the Terms of Use that Lamonaco agreed to, and he included screenshots depicting the pages Lamonaco encountered during enrollment.

141 F.4th at 1347–48.

This case is likewise distinguishable from *Bazemore*. Here, like in *Lamonaco*, Vijay Rao's declaration described the enrollment process in detail; stated that Lopez enrolled in Bluelink on July 3, 2021; asserted that Rao had personal knowledge based on internal business records; attached the CSA; attached business records showing that the attached CSA is the version Lopez accepted; and provided a screen capture of what all customers see on their screen when enrolling in Bluelink. Lopez does not argue that the screen capture or the CSA in the record are different from what she was presented with nor challenge the business records showing that the checkbox was selected. She does nothing more than generally assert that the Defendants lack evidence. But even without definitive proof of exactly what appeared on Lopez's screen, *Lamonaco* establishes that the Defendants' evidence is sufficient.

To contradict the Defendants' version of events, Lopez asserts generally that she "do[es] not recall any involvement in the Blue Link signup process" because "the sales representative of Rick Case Hyundai set up Blue Link on [her] behalf." (Doc. 35-1 at 2). This does not contradict the Defendants' evidence. Her assertion that the sales representative "set up Blue Link on [her] behalf" does not contradict Rao's statement that all dealer employees were trained to always require the purchaser to click the button to accept the "Terms & Conditions"; and her lack of recollection in being "involved" in the Bluelink sign up process is not clear enough counter-evidence showing that she did not select the checkbox.

Lopez further states that she did not review the CSA, that the arbitration agreements therein were not disclosed to her, and that had she known of them she would not have enrolled in Bluelink Services. (Doc. 35-1 at 2–3). But these facts are inapposite to whether she assented to the CSA's terms. *See Thornton v. Uber Techs., Inc.*, 858 S.E.2d 255, 259 (Ga. Ct. App. 2021) ("[F]ailure to read does not excuse a party's obligations under a contract."). Lopez states that she "was led to believe that Blue Link was provided to [her] . . . without limitation of [her] rights." (Doc. 35-1 at 2). But she does not make any fraud argument. She alleges that she "never paid any money or other things of value in exchange for Blue Link" and that she has "never used, or been able to use Blue Link." (Doc. 35-1 at 2). But she does not make an argument that the contract is void for lack of consideration. Finally,

she asserts that she "did not have any input or choice about the content of the terms and conditions" (doc. 35-1 at 3), but she does not make any unconscionability arguments. The court will not formulate these arguments for her in order to give her factual assertions significance. *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. . . . Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

There is also evidence establishing that Lopez assented to the service's Terms of Use by subsequently logging into her account. According to the Defendants' evidence, on August 14, 2021, Lopez accepted the terms of the CSA using the Customer Web Portal. (Doc. 33-1 at 6). None of the statements in Lopez's declaration address this evidence. Because Lopez does not have any evidence to specifically challenge the veracity of the Defendants' evidence, the court deems the Defendants' evidence sufficient and finds as a matter of law that the parties formed an arbitration agreement.

## IV. The Delegation Provision

Having concluded that Lopez assented to the arbitration agreement in the CSA, the court must turn next to the delegation provision contained therein. The

delegation provision must be analyzed under California law pursuant to the CSA's choice-of-law provision. *See Dunn*, No. 21-10120, 2024 WL 4379966, at *6 (stating that the delegation issue is governed by state law and that a choice-of-law provision in a contract determines which state's laws govern).

The Eleventh Circuit has stated:

> If the arbitration agreement does contain a delegation provision, the court must then determine: (a) whether the parties have manifested a clear and unmistakable intent to arbitrate the relevant gateway issue; (b) whether the claimant has challenged the delegation provision specifically; and, if so, (c) whether the delegation provision is enforceable under the FAA.

*Dunn*, No. 21-10120, 2024 WL 4379966, at *6. The analysis in this case begins and ends with the first prong. The parties have not manifested a clear and unmistakable intent to arbitrate the relevant gateway issue.

The Defendants have cited three U.S. District Court decisions applying California law and concluding that the CSA's delegation clause is sufficient to show a clear and unmistakable intent to delegate. *See Nunn v. Hyundai Motor Am.*, No. 8:25-CV-01091-JVS-KES, 2025 WL 2683990 (C.D. Cal. Aug. 28, 2025); *Franz v. Hyundai Motor Am.*, No. 8:23-CV-01640-NS-ADS, 2024 WL 176227 (C.D. Cal. Jan. 12, 2024); *Maranda v. Hyundai Motor Am., Inc.*, No. 822CV02193JVSJDEX, 2023 WL 6474450 (C.D. Cal. Oct. 2, 2023). The undersigned agrees with those courts.

Lopez relies on *Hageman v. Hyundai Motor America*, in which the U.S. District Court for the Central District of California applied California law to an arbitration provision identical to the one in this case. 758 F. Supp. 3d 1194 (C.D. Cal. 2024), *aff'd sub nom. Hageman v. Hyundai Motor Am., Inc.*, No. 24-7823, 2026 WL 821890 (9th Cir. Mar. 25, 2026). In *Hageman*, the court found that the parties did not clearly and unmistakably agree to arbitrate gateway issues of arbitrability. The court reasoned as follows:

> Although [the CSA] states that "all issues are for the arbitrator to decide", it goes on to say ***in the same section***, "[h]owever if putative class or representative claims are initially brought by either party in a court of law, and a motion to compel arbitration is brought by any party, then the court shall decide whether this agreement permits class proceedings." *Id.* That is exactly the situation here. So which is it? Does an arbitrator or the Court decide if a Plaintiff in a putative class action must go to arbitration? Or does the Court first decide the question of whether the agreement permits class treatment (presumably including the question of class certification) and, if so, then leave the case to proceed as a class action in arbitration?[3] The language is the very opposite of "clear and unmistakable." To the contrary, it is convoluted at best and contradictory at worst.
>
> Moreover, the delegation language in the CSA is inconsistent with the severability clause in Section 16(E), which states that "[i]f any part of this Agreement is considered invalid *by a court* or arbitrator, the rest of it will remain enforceable." . . . (emphasis added).
>
> . . . .
>
> [3] The Court can imagine many other possible interpretations and variations on how to attempt to reconcile these two clauses. What is clear is that Hyundai wants to have its cake and eat it too—*i.e.*, to require the arbitrator to decide (almost) everything but to create a huge carve-out benefitting Hyundai so that only a judge—and not an

> arbitrator—can allow a case to proceed as a class (presumably so that an appeal can be filed, if necessary). But that still leaves the initial question up in the air because it is unclear who decides if a ***class plaintiff*** must go to arbitration in the first instance? And if this Motion is granted and the case goes to an arbitrator, when exactly would the Court decide "whether this agreement permits class treatment"?

*Id.* at 1201–02 n.3. The Ninth Circuit recently affirmed the court's reasoning in *Hageman*, writing: "[T]he district court correctly held that the arbitration agreement's delegation clause is not clear and unmistakable because it expressly reserves class issues to courts." *Hageman v. Hyundai Motor Am., Inc.*, No. 24-7823, 2026 WL 821890, at *1 (9th Cir. Mar. 25, 2026). The court does not find *Hageman* persuasive.

The Ninth Circuit decision in *Hageman* was an unpublished memorandum decision and is not binding on this court, and the undersigned disagrees with the district court's reasoning. As far as this court is aware, there is no rule mandating that parties delegate *all* gateway issues of arbitrability to the court and that they cannot carve out some issues to delegate while reserving others for the court to decide. *See Maranda v. Hyundai Motor Am., Inc.*, No. 822CV02193JVSJDEX, 2023 WL 6474450 (C.D. Cal. Oct. 2, 2023) (finding that the delegation clause in the CSA was clear and unmistakable and had a "carve-out" for the class arbitrability issue). Here, although the parties initially stated that they were delegating "all" arbitrability issues to the arbitrator, they followed up that statement with a clear exception: the issue of class-arbitrability. The phrasing "all except the following

carve-out" is commonly used and understood to mean "everything except for this one thing." Although the parties did not use this exact phrasing in one integrated sentence, the paragraph containing the delegation clause, when read in its entirety, communicates the same meaning. The parties have manifested a clear and unmistakable intent to delegate all issues to the arbitrator except for class arbitrability.

The district court noted that the carve-out in the delegation provision benefited the defendants, and that the defendants drafted the agreement. *Id.* at 1202 n.3. But the test for determining whether gateway issues have been delegated is not whether the delegation is fair—instead, it is simply whether the agreement to delegate was clear and unmistakable. In this case, the delegation provision—while nuanced because of the carve-out—is clear and unmistakable. There is no evidence that the parties agreed to delegate the issue of class arbitrability to the arbitrator. Thus, the court must review that issue. *See JPay, Inc. v. Kobel*, 904 F.3d 923, 929–30 (11th Cir. 2018) (holding that clear and unmistakable intent to delegate is required before a court will compel a gateway arbitrability issue like class arbitration to an arbitrator as such issues are presumptively for the court to decide).

The undersigned further finds that the severability clause does not contradict the delegation provision. The court in *Hageman* noted that many California courts have held that, where an arbitration agreement includes a severability clause that

implies a role for the court, "gateway issues of arbitrability are not clearly and unmistakably referred solely to the arbitrator." *Id.* at 1202. However, the statement that a court may invalidate "part of" the CSA is consistent with the provision stating that a court may review the class arbitrability issue because, in that review, a court could find the class and representative waiver unconscionable or otherwise invalid. In fact, in general, a court must always address the unconscionability of an arbitration agreement when it is challenged (and the unconscionability of a delegation provision if it is specifically challenged).[3] *See Reiterman*, 26 F.4th at 1231 ("Courts must decide any challenges to the existence of the contract or to the validity of the arbitration clause standing alone before compelling arbitration."); *Dunn v. Glob. Tr. Mgmt., LLC*, No. 21-10120, 2024 WL 4379966, at *6 (11th Cir. Oct. 3, 2024) ("If the arbitration agreement does contain a delegation provision, the court must then determine: (a) whether the parties have manifested a clear and unmistakable intent to arbitrate the relevant gateway issue; (b) whether the claimant has challenged the delegation provision specifically; and, if so, (c) whether the delegation provision is enforceable under the FAA."). Therefore, it is congruent for an agreement to state that arbitrability issues are delegated to the arbitrator, except for class arbitrability, and that a court may invalidate a portion of the agreement.

---

[3] In her response to the first motion to compel, Lopez challenged the arbitration provision and the delegation provision as unconscionable. (Doc. 19 at 26–32). In her response to the instant motion to compel, however, she abandoned that argument. (*See* doc. 35).

According to the delegation and severability provisions, the undersigned must decide only the threshold question of whether the CSA "permits class proceedings" and may invalidate parts of the agreement. The court may not address Lopez's argument that this action falls outside the scope of the CSA.

## V. The Magnuson-Moss Warranty Act Claim

Lopez argues that the MMWA claims cannot be compelled to arbitration. (Doc. 35 at 6–8).[4] She is correct that, in *Cunningham v. Fleetwood Homes of Georgia, Inc.*, 253 F.3d 611 (11th Cir. 2001), the Eleventh Circuit affirmed a denial of a motion to compel arbitration of MMWA claims because the warrantor failed to disclose in a single document all relevant terms of the warranty, including the arbitration clause. *See also Adkins v. Palm Harbor Homes, Inc.,* 157 F. Supp. 2d 1256, 1260 (M.D. Ala. 2001) ("[U]nder the circumstances of the arrangement in this case, which are the same in all material respects as the arrangement in *Cunningham,* Adkins cannot be compelled to arbitrate his written express warranty claims which are brought as a statutory cause of action under the Magnuson–Moss Warranty Act."). However, neither *Cunningham* nor *Adkins* involved delegation provisions.

[4] In its briefing on the first motion to compel arbitration, the Defendants agreed with Lopez that the MMWA claim could not be compelled to arbitration. (Doc. 23 at 25). However, in its reply brief in support of the instant motion to compel, the Defendants argue the opposite. (Doc. 36 at 10). The court notes that one of the cases the Defendants rely on in their reply brief was not decided until after the briefing on the first motion to compel concluded. (*See* doc. 36 at 10) (citing *Maus v. Hyundai Motor Am.*, No. 25-CV-07937-HSG, 2026 WL 974512, at *5 (N.D. Cal. Apr. 10, 2026)).

Here, the court has already found that the gateway questions of arbitrability, such as the scope and enforceability of the arbitration agreement, have been delegated to the arbitrator. Therefore, the Court "possesses no power to decide the arbitrability issue," even if it "thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019). Accordingly, the court must compel the issue of the arbitrability of the MMWA claims to arbitration. *See, e.g.*, *Pagano v. NordicTrack, Inc.*, 749 F. Supp. 3d 1183, 1198 (D. Utah 2024) ("Because the parties agreed to allow the arbitrator to determine questions of arbitrability, including the scope of the matters that are subject to the parties' arbitration agreement, the arbitrator—rather than the court—should determine whether the MMWA alters the scope of arbitrable issues in this case."); *Giles v. Hamilton Home Builders LLC*, No. CV 23-00323-KD-MU, 2023 WL 8459907, at *9 (S.D. Ala. Dec. 4, 2023) (compelling MMWA claims to arbitration); *Cadena v. Am. Honda Motor Co.*, No. CV 20-511-MWF (PJWX), 2020 WL 3107797, at *8 (C.D. Cal. June 10, 2020) (compelling the MMWA claims to arbitration because "the scope of arbitrability is up to the arbitrator, not this Court, subject to the clear delegation clause").

## VI. The Availability of Class Arbitration

Given the class arbitration carve-out, the Defendants move for Lopez's claims to be arbitrated on an individual basis. (Doc. 33 at 21). "[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010). Here, the CSA clearly states that "[a]ny arbitration under this agreement will take place on an individual basis" and "class arbitrations, class actions or representative arbitrations are not permitted." (Doc. 33-5 at 11). Lopez's assent to the CSA also includes assent to this class arbitration waiver. Accordingly, the court finds that she waived her right to bring claims against the Defendants as a class representative. Lopez must arbitrate her claims on an individual basis.

## VII. Conclusion

For the reasons set forth above, the pending Motion to Compel Arbitration and Stay Proceedings (doc. 33) is **GRANTED**. This case is **STAYED** pending arbitration between the parties. Counsel is hereby **ORDERED** to notify the court within 10 days after the final decision is rendered.

**DONE** and **ORDERED** on this the 19th day of November, 2026.

**BILL LEWIS**
UNITED STATES DISTRICT JUDGE